UNITED STATES of America,
Appellant,

v.

LEAVELL & PONDER, INC., and
Morgan Company, Inc.,
Appellees.

No. 18427.

United States Court of Appeals
Fifth Circuit.

Jan. 23, 1961.

Rehearing Denied March 7, 1961.

A. Donald Mileur, Roger P. Marquis, Attys., D. of J., Washington, D. C., Perry W. Morton, Asst. Atty. Gen., D. of J., for appellant.

William Duncan, Eugene T. Edwards, El Paso, Tex., for appellees.

Before TUTTLE, Chief Judge, and RIVES and JONES, Circuit Judges.

TUTTLE, Chief Judge.

This is an appeal by the government from an award in a condemnation of a Wherry Housing Project. The matter was originally referred by the trial court to three commissioners as authorized by Rule 71A, Federal Rules of Civil Procedure, 28 U.S.C.A. The findings of fact and conclusions of the commissioners were accepted in full and adopted by the trial court.

The principal grounds of the government's appeal are: (1) the commissioners made a finding of value based on evidence of a prior sale of part of this same property, whereas such prior sale was not for cash or its equivalent, but was for part cash and part exchange of real estate, and as to the real estate no proper appraisal was made to support the value assigned to it by the parties to the transaction; and (2) in making a finding of value based on the capitalization of anticipated income from the property the Commission utilized a 4½% rate of return which was unrealistic and without support in the evidence; and (3) in making a further finding of value based on capitalization of income after a deduction for corporate income taxes the Commission made improper assumptions, departed from accepted principles of valuation in taking income taxes into consideration, and utilized a 2¾% ratio of return which was unrealistic and without any evidentiary support in the record.

The property condemned comprised leasehold interests in some 124 acres of government owned land within the Fort Bliss Military Reservation at El Paso, Texas. There were two practically identical developments, one owned by each of the two corporate appellees. Both projects combined were known as Van Horne Park. The leasehold interest had been improved by the construction by each of the sponsors of some 400 dwelling units and by the joint construction of a shopping and trade center.

The characteristics and nature of a Wherry Housing Project have been fully discussed by this Court in United States

v. Benning Housing Corporation, 5 Cir., 276 F.2d 248, and by the Court of Appeals for the Tenth Circuit in Buena Vista Homes, Inc. v. United States, 10 Cir., 281 F.2d 476. In the Benning Housing case we said:

"In order to evaluate the contentions as to rent control, a brief survey of the background of these projects seems necessary. The projects were constructed under the aegis of the Wherry Act, which was enacted on August 8, 1949, in an attempt to relieve an acute shortage of housing which existed at that time at military installations throughout the country. The Act envisioned the construction of this needed housing by private builders and its provisions were consequently specifically designed to remove what appeared to its chief proponents to be the major impediments to such construction. The then current view of the problem was concisely expressed by Senator Wherry himself:

" 'There are three requisites that must be provided in this legislation if it is to be successful: The program must be attractive to the builder or else you will get no construction; it must be attractive to the mortgage banker who supplies the money; the project must be made attractive to the Federal Housing Authority to enable it to set rental prices within the reach of families in the lower income brackets as well as in the higher brackets. [S.Rep. No. 231, 85th Cong., 1st Sess., at p. 11.]'

"The Wherry Act proposed to meet these requisites by providing for: (1) the elimination of land and acquisition costs by the leasing of land on military installations on long-term, irrevocable leases at nominal rentals; (2) a special form of mortgage insurance which avoided the problem created by the fact that ordinary F.H.A. mortgage insurance was unavailable because of the risk involved by reason of the location of the needed housing and the question as to the permanent nature of the military installations; and (3) F.H.A. control over the rents which could be charged for housing constructed under this plan.

"Considered in the light of the purposes of the Wherry Act, the proper resolution of the controversy seems clear. The condemnees' argument rests squarely upon a basic misconception of those purposes. For condemnees presuppose that the inducements offered by the Wherry Act to stimulate building, i. e., leases at nominal rentals and Government-insured mortgages, were outright gifts to the Wherry sponsors and for which the Government would not, and, indeed, could not, exact a return. Such is not the proper interpretation of that Act. These inducements were offered in return for lowcost housing. It is clear that the policy has consistently been one of allowing a return based upon original cost rather than reproduction. Rent increases were sanctioned only to offset rising operating costs and not to compensate for increased reproduction costs. The Act did not contemplate that sponsors would recover reproduction costs on a sharply rising market. And there was nothing unfair in its failure to do so. By insuring the mortgages on the projects, the Government assumed the risk of loss on a declining market. In such a situation, respect for the public interest practically required that no benefit should accrue to the sponsors as a consequence of inflation." 276 F.2d 248, 252.

It should be added to this that the sponsors were also subject to regulations relating to methods of operation of the housing.

The housing projects here sought to be condemned were required to be condemned under the terms of the Capehart Act, 42 U.S.C.A. § 1594a(b). Under

this Act before the Federal Government could undertake to build similar housing on military reservations, it was required to acquire title to the Wherry projects. Construction on the Van Horne projects began on March 1, 1950, the first units were occupied on July 22, 1950, and all units were completed and occupied by April 15, 1951. The total cost of construction of each of the two units was $3,400,400.00.[1] The original mortgage was for $3,316,000.00.[2] Under the terms of the law the owners were permitted to and did receive rentals on the units without any obligation for mortgage or interest payments until September, 1951. Such rentals amounted to a net sum of approximately $100,000.00 for each project.

The declaration of taking by the government was accompanied by a deposit of $291,000.00 for each property. The commission found that the correct value was $977,266.47. The duty facing the commissioners was to make findings of fact and arrive at conclusions based on such findings fixing the fair market value of Van Horne Park, taking into consideration all of the facts and circumstances that would reasonably go into the making of a bargain of purchase and sale between a willing buyer under no obligations to buy, and a willing seller under no obligations to sell. Messer v. United States, 5 Cir., 157 F.2d 793. Gwathmey v. United States, 5 Cir., 215 F.2d 148.

We have held that in a condemnation of Wherry Housing projects the means of proving such market value may not include proof of reproduction cost less depreciation. United States v. Benning Housing Corporation, supra. In that case we stated that the means of ascertaining fair market value in such a case

as this must be "on the basis of comparable sales, capitalization of income and original cost."

The commission heard considerable testimony as to reproduction costs of these projects. It expressly held, however, that this should not be considered in arriving at its determination of value. Its determination resulted from computations which it made after making certain findings of fact as an aid in arriving at a valuation by capitalizing projected net income. The commission's findings of fact and conclusions resulting from such findings were as follows:

"As a basis on which to arrive at the Owner's loss, the Commission in its deliberation has projected the income of the owners to the end of the considered economic life of the properties, fifty years, less 7 years passed, and has taken into consideration, as to interest paid on the mortgage, only the diminishing annual interest payments to date of the mortgage's complete liquidation, and finds the Owner's potential net gain to be $6,615,341.38, for each one-half of the project. The present value of $1.00 at what the Commission finds to be the proper interest rate of 4½% (4% F.H.A. mortgage insurance, plus ½% mortgage insurance) compounded annually for 43 years, for each one half is $996,-670.91, which sum, we find to be the Owner's loss.

"The Commission has further considered the fact that if the purchaser of such property were a corporation it would pay an income tax of 52%, after giving credit for an exemption as provided by law for the first $25,000.00 in income each year exempt from the surtax. The

---

1. The commission treats each unit separately in connection with its findings which we discuss hereafter. Unless otherwise indicated, therefore, items of cost, income and valuation will relate to one of the units.

2. The Government's reply brief calls attention to the fact that there was an additional commitment of $247,500 for each project to construct the shopping center. The briefs do not make clear whether the total cost of construction given above includes the cost of constructing the shopping center.

projected income above shown $6,-615,341.38, less the calculated income tax leaves a balance of $3,-411,863.86, which the Owners could have expected to take home after taxes. The Commission has then used this figure and considered it as 'non-taxable' income to ascertain what a prudent buyer would be required to invest in non-taxable securities to obtain the above figure. It is the Commission's opinion that an earning rate of 2 and ¾% would be proper, and it has therefore reduced such net 'non-taxable' income to a 'present value' using published tables as heretofore stated and arrived at the Owner's loss of $1,-062,607.75, for each one-half of the property.

"Had this property been purchased by an individual rather than a corporation, it is reasonable to assume that he would be a person of considerable wealth and income and that his income tax would equal or exceed the corporation rate of 52%.

\*    \*    \*    \*    \*    \*

"The Commission, in view of the foregoing considerations and findings, has arrived at a determination of the value of the loss to the Owners, by virtue of the taking of the Van Horne Park as follows:

"(a) Loss sustained (one-half of project) by using net income projected over economic life of improvements, before income taxes, reduced to present value.

$996,670.91.

"(b) Loss sustained (one-half of project) by using net income projected over economic life of improvements, after Federal Income Taxes reduced to present value, the income being used as 'non-taxable'.

$1,062,607.75."

Having made such findings and conclusions, the commission then arrived at a third conclusion of value which is the one it fixed as the amount of the award. This conclusion was:

"(c) Value of consideration of sale of Morgan Company, one-half interest to Ponder Interests, $940,-000.00 adjusted for subsequent mortgage annual retirements, and diminished by sustained economic depreciation, and including cash consideration of $172,000.00.

$977,266.47."

The finding of fact to support this conclusion was the following:

"Second: The Commission finds that the sale of the Morgan Company's one-half interest in the Van Horn project is worthy of consideration and weight in arriving at the fair market value as viewed by a willing seller and a willing buyer, without duress. The testimony of Mr. Ponder and Mr. Morgan has been accepted as that of competent local investors, to the value of the assets exchanged in the transaction, stated to be at $900,000.00 and $940,-000.00, respectively. All evidence in regard to this transaction has been carefully considered."

The consideration of the evidence relating to this transaction is one of the matters sharply criticized by the United States. Careful analysis of the transaction convinces us that this criticism is well merited.

In 1953 appellee Morgan Company, Inc. was a corporation owning one of the two projects constituting Van Horne Park. Its stock was all owned by the Morgan family who desired to sell it to Dan R. Ponder, Inc., owned by Dan R. Ponder. A deal was worked out and a written contract was executed in which the entire Morgan Company stock, representing the ownership of the housing project was sold to Ponder. The contract provided that Ponder had the option of paying $217,000 cash or $172,000 cash, 10.34 acres of land in fee and transfer of options to purchase a tract of 50.93 acres and one of 10.34 acres of land. Ponder actually paid $172,000 cash and transferred the land and options as payment of the purchase price.

Clearly, if this contract correctly stated the terms of the agreement between the parties, then Morgan, Inc. was bound by a contract to sell its project to Ponder for $217,000. Such Contract, even though made some five years before the taking would be relevant evidence for the commission to consider in determining fair market value on this condemnation procedure. This would be true because it would represent an arm's length transaction between two persons neither under compulsion. Changes in land or construction values in the interim would not affect the value because all the purchaser would be buying in any event would be the equity value in a leasehold which was shown by the evidence to be producing the same net income during the intervening years. When the government made its payment into court on the filing of its declaration of taking, it doubtless laid great stress on this apparent sales price of $217,000. Such estimate of value was doubtless further bolstered by the fact that the Ponder and Morgan interests all reflected this $217,000 value on their income tax returns for the year 1955, and the assumption that such return spoke the truth, or, at least, made it impossible for the parties to contend for a higher value as of that time. Not only did Ponder, Inc. pay a tax on the declared value of $45,000, since this was a taxable exchange, but on the deed to the 10.34 acres transferred in fee it placed $33.00 in stamp taxes, representing its value to be $30,000.00.

Any such theory of the Government, however, was shattered when Ponder took the stand in this proceeding and testified that the land and options which he had represented on his company's books and 1953 income tax return to be worth $45,000 *was really worth at that time* $900,000.00, *twenty times as much* as reported for tax purposes. The 10.34 acres that bore stamps showing a value of $30,000 he testified was worth $563,-000. Then, having claimed that the real consideration for the trade was not $45,-000, as reported for income and stamp

tax purposes, but was $900,000, Mr. Ponder, as a witness, said this still represented only part of the real value of the property at the time of the taking—that the true value which he should receive was $700,000 more, or $1,600,000.

The commission, as shown above, credited Ponder's testimony to the penny as to the value of the project in 1953, and its award was the exact amount of this valuation, after adjustments, which were purely mathematical adjustments not affecting value.

■■ The government complains on two principal grounds. Basically, it says, it is improper for the condemnation court to consider transfers of the same or comparable property as a standard of value unless the sale is for cash or its equivalent (such as notes secured by the land or the like). This is to say, in the process of valuing tract A (Van Horne Park), which is the matter before the court, the court cannot consider a sale or exchange of tract A at an earlier date if such transfer is made partially for cash and partially for tracts B and C. In support of this contention the United States cites: Jefferson Park Dist. v. Sowinski, 1929, 336 Ill. 390, 168 N.E. 370; Goodman v. Bethlehem, 1936, 323 Pa. 58, 185 A. 719; Fort Worth Imp. Dist. No. 1 v. Weatherred, Tex.Civ.App.1912, 149 S. W. 550; Oregon R. & Nav. Co. v. Eastleck, 1909, 54 Or. 196, 102 P. 1011.

The Illinois court in the Jefferson Park District case said: "To render evidence of sales competent they must be for money, and not, in whole or in part, by way of exchange." 168 N.E. 370, 371. This case cited as authority the earlier decision in Sanitary District v. Boening, 267 Ill. 118, 107 N.E. 810.

In Goodman v. Bethlehem, supra, the Pennsylvania court said, in ruling out testimony as to what the condemnee had paid for the property: "The testimony indicates that the property was purchased not for cash, but was traded in for other real estate; this situation would have necessitated an investigation into the values of these other properties

which would undoubtedly have been confusing to the jury." 185 A. 719, 724.

The United States also refers us to Hannan v. United States, 76 U.S.App. D.C. 118, 131 F.2d 441, 443, in which the Court affirmed the refusal of the trial court to receive evidence of an earlier offer for the same property saying, "The consideration offered consisted in part of other property and, consequently, involved collateral issues concerning its value."

We think the facts of this case are a clear demonstration of the inherent weakness of the evidence of prior sales of the property in question unless they are sales for cash or its equivalent. Here the court is concerned with the valuation of tract A (in the above illustration). Hundreds of pages of testimony were given touching on this issue, yet the commission found as the value the exact amount the parties testified was paid by Ponder for the Morgan half. But this testimony was based on certain assumptions as to the values of tracts B and C which were transferred as part of the exchange. These assumed values of tracts B and C were treated so casually as to be absolutely meaningless in a search for the true value of the project. They amounted to nothing more than the extremely self-serving contradictory testimony of the parties that what they reported for purposes of fixing their income tax and stamp tax liability was worth $45,000, was really, in their unsupported opinion, worth $900,000. None of the sifting and testing which all parties recognize must precede the acceptance of opinion evidence of value in the case of tract A was carried out with respect to tracts B and C. As a result, all the inquiry that was made and all the testimony of the qualified experts on value after full sifting and testing was cast to the winds by the commissioners when they accepted this evidence touching on the sale price of the Morgan tract as fixing the value for condemnation purposes.

The second ground on which the government complains is that the condemnees, themselves, in arguing the case to the commission, took the position that proof of the Morgan sale at $977,266.47 was not relevant evidence on the issue to be decided. They took this position on the very ground that the government is now urging it, that is that the sale was not for cash but was an exchange of properties. Of course, they took that position before the commission because they were then claiming a value of $700,-000 more than they were now testifying was the correct sales price in 1955. But, whatever their purpose, they took the position that proof of the sale was irrelevant, and the government contends that they should be bound by that position.

Here, however, the appellees contend that the government itself is not in a position to object to the consideration of the evidence of this sale because the government took the deposition of Mr. Morgan relating to the sale in preparation for the trial and indicated that they were planning to rely upon proof of the sale of the Morgan tract. This overlooks completely the basis on which the government had a right to use the sworn facts relating to the earlier sale as an admission by Ponder, one of the parties to the condemnation proceedings. The contract on its face showed that the Morgan interest was valued at $217,-000. The government had a right to introduce that contract in evidence in an effort to prove an admission limiting its value to that figure. This would be clearly admissible because the contract expressly stated that Ponder had the privilege of paying cash for the property. There would thus be no question as to an exchange of properties. No such correlative right could be the basis of the condemnees' proof that the sale had actually been made at $900,000 by exchange of properties. Because of the final disposition which we make of this case we do not decide whether it was error to admit the evidence of the Morgan sale. We have no doubt of the government's right to introduce the contract if it desired to do so in an effort

to show an admission. We think that in spite of the inconsistency of the proof of value, hereinafter discussed, the condemnees have the right to show that the $217,000 figure did not represent the true consideration.

We next deal with the inconsistent position taken by the witnesses Ponder and Morgan here when compared with their action in filing their income tax returns in connection with this sale. While we cannot say the evidence touching on this matter was wholly valueless on this ground, we discuss it to indicate how such collateral issues, when brought into the case, might be extremely confusing to a jury or other fact finder unless strictly controlled by application of recognized rules of evidence. This inconsistency is in the nature of the testimony dealing with the action of the parties to the Morgan transaction. The reason given by the accountant witness, Martin, for drawing up the contract of sale of the Morgan half in the form of an option to pay $217,000 cash or to pay $172,000 and land worth $45,000 shows that a palpable fraud on the government was committed if the present testimony of Ponder and Morgan is to be believed. Martin testified: "Phrasing it slightly differently, in 1953 there was a technical realization of gain under the Internal Revenue Code, but there was no money. What the parties wished to do was to defer the maximum amount of tax until such time as they got the money with which to pay the taxes."[3]

Martin said that although he knew the sale was a taxable exchange and that property received and given in exchange must be reported *at its fair market value*, the parties, with his knowledge, "reach[ed] up in mid-air and pull[ed] down a figure—any figure they wanted to," and that is what they reported for income tax purposes. He said that he told the parties they could put on their books the "lowest value of the land which results when it is appraised as being used for, let's call it the *cheapest type of use* feasible or *possible* to put the land to," and that he was then faced "with a problem of how to make this *arbitrary* evaluation that had been used by the parties, how to make that acceptable to the Internal Revenue Service upon an examination of the applicable income tax returns, and this option to pay cash on the part of Ponder's part, the option on the part of Ponder to pay— yes, the option to pay $172,000 cash and the real estate rights or to pay $217,000 cash was put in there in an *attempt to buttress the evaluation used when the tax returns were examined by the Internal Revenue Service*." (Emphasis added.) It was then testified to by Ponder, "It was understood from the outset that the Morgans would get the land and we were to get the stock." He testified, "Never at any time did I consider that I had [the] election [of paying $217,000 in cash]."

As plainly, therefore, as the parties could say it, these witnesses testified on the trial of this present case that they had put a "job" over on the Internal Revenue Service by making it appear that Ponder could buy the Morgan property for $217,000, but this figure was just a sham, put in to cut down the income tax, and that there was a side agreement that Ponder could not pay the cash but must transfer the property. This property, they say, was really worth something over $1,000,000 at that time and they should not be stuck with the figures they had reported on their income tax return. We think the most charitable thing that can be said of this argument and of this testimony is that being contrary to the previous statement of the witnesses in a matter requiring the utmost accuracy, either the representations to the government on the tax returns

---

3. This is euphemism for saying, "On this exchange of properties a tax was due, but the parties elected to pay the tax on only a part of their gain and to postpone the rest of it until it was more convenient for them to pay it,"—a clear and intentional violation of the tax laws to the extent that the true gain was not computed on a correct valuation of the property.

406

were false or this present statement of the value in 1953 is false, and acceptance by the commissioners of the present testimony at its full face value amounts to a finding that the parties to the Morgan sale deprived the government of the income tax for 1953 on a gain of some $900,000.

We do not need to hold that this glaring inconsistency alone prevents this testimony from amounting to substantial evidence in order to set aside the finding of a valuation of $977,267.47 based on the Morgan sale. We set it aside because there was no substantial proof of the values of the two interests in land transferred in partial payment of the Morgan property. If evidence of a prior sale involving an exchange of lands is to be considered as proof of present valuation, the values of such exchanged lands obviously must be proved by the same standards as attends proof of value of the property being condemned. Then it becomes the task of the trial judge to determine ordinarily whether such collateral issues would be so confusing or so lengthy as to cause him to rule out any effort to prove value of the condemned tract in such a fashion.

We do not mean that if the government introduces the Morgan contract the condemnees may not reply to it, even by showing the inconsistency discussed above. We do hold that the unsupported statement that they considered the property worth over $900,000 in 1955 rather than the option price can be considered only in rebutting the option figure and not as affirmative proof of a higher value.

As we have pointed out, it was the Morgan sale at the claimed value of $977,266.47 that the commissioners used as the basis of their award. In their findings, however, they stated that they had considered and weighed all the other testimony. As pointed out above, they made specific findings of the loss to the condemnees of $996,670.91 by a process of capitalizing the net income projected over the economic life of the improve-ments and of $1,062,607.75 by capitalizing the same income by a process of excluding federal income taxes. We find that neither of these findings is remotely supported by any evidence in the record.

As to the first figure, the finding of fact is based on conclusions which we have quoted above. It shows that the commissioners found the economic life of the properties to be a total of 50 years— that is 7 years that have already passed, and 43 years for the future. This finding of fact is amply supported by the evidence and we cannot set it aside as clearly erroneous. The commissioners also found that the owner's potential net gain for the 43 year period, according to the testimony and books and records in evidence, would be $6,615,341.38. The total net income figure varied widely in the testimony of the several witnesses. Some of the witnesses testified that the total income must be reduced by the cash reserves on hand at the time of taking, because they were necessary for replacement of equipment.

The figure arrived at by the commissioners would much better have been supported by subsidiary findings of fact. At least a finding as to the need for replacing the cash reserves for depreciation for short-lived equipment would have been almost essential to an understanding of the figure. Without adequate subsidiary findings it is impossible for this Court to test the correctness of the elements of which it is the product or the sum. See United States v. Buhler, 5 Cir., 254 F.2d 876, 882. Moreover, the commissioners erred in assuming that the total would have been received in one lump sum at the end of the 43 years. It is perfectly clear from the record that any computation based on such assumption would be erroneous, since the rentals are payable over the life of the lease.

The next conclusion that the proper interest rate at which to capitalize such future income is 4½% is utterly without support. The lowest such figure testified to by witnesses introduced

by the condemnees was a rate of 6%. It is not clear from the record that this figure was based on a proper hypothesis. Moreover, the explanation given by the commission that the 4½% rate, used by it, represented the mortgage rate on F.H.A. mortgage of 4%, plus ½% for mortgage insurance, demonstrates that the use of the 4½% rate for the equity ownership borders on the ridiculous. We think that an appellate court is required to disregard a finding that an ordinary prudent investor would be as willing to invest his money in an equity in F.H.A. controlled low rent housing on leased land, with all the hazards of occupancy and of continued uninterrupted maintenance of the military installation, as he would in a first mortgage on the same property absolutely guaranteed as to principal and interest by the United States government. As has aptly been said, "An equity in real estate is like a bumper on an automobile—it must take all the shocks first." Of course, such a finding must be disregarded here, in any event, because it was not supported by the testimony of a single witness.

■ The other findings, based on an assumption that a prospective purchaser would be a corporation that would "pay an income tax of 52% or would be an individual as to whom it is reasonable to assume that he would be a person of considerable wealth and income and that his income tax would equal or exceed the corporation rate of 52%," so far as we are able to find, are without precedent in any kind of valuation proceedings. Certain it is that the record contains no testimony touching either on these matters or on the fact that a rate of return of 2¾%, after deduction of 52% of the total net income "would be proper." This must also be disregarded.

■ Finally, objection was made by the United States during the hearings to the reception of evidence of the rate of return on certain types of corporate securities and evidence that this equity would be "a conservative investment." There is no place in valuation proceedings for such testimony. For one to give an opinion on value he is ordinarily required to base such opinion on knowledge of sales at arm's length and without compulsion of comparable properties or on knowledge of the rate of return which the ordinary prudent investor requires in order to invest in a comparable project when he has complete freedom of choice.

■ Here the government introduced in evidence opinions based on sales of other Wherry housing projects. In view of the size of these projects and their potential attraction to others besides local investors, we have held that such sales are proper for consideration in such proceedings. United States v. Benning Housing Corporation, supra. So, too, were opinions based on the rate of return earned on the sales prices of large apartment properties with consideration given to the fact that the owners of this housing were not free to charge such rents as the traffic might bear. Opinions based on such information fits within the language of the Benning Housing Corporation case, in which we said: "Valuation [such as this must be found] on the basis of comparable sales, capitalization of income and original cost." Clearly "capitalization of income" comprehends the use of a rate of return in comparable investments. Evidence of rate of return that is in no way related to a comparable investment does not meet this requirement.

The absence of any conclusion of value supported by competent evidence in the record requires that the judgment of the trial court be set aside.

■ Although we would not consider it necessary to reverse the judgment solely because of the submission of this case to commissioners, if it were not necessary to reverse the judgment on the merits, we do conclude that on the record it was error for the trial court to make such reference.

In the Buhler case we clearly stated that such references are the exception and not the rule.

Rule 71A (h), F.R.Civ.P. provides:

"* * * Any party may have a trial by jury of the issue of just compensation * * * unless the court in its discretion orders that, because of the character, location, or quantity of the property to be condemned, or for other reasons in the interest of justice, the issue of compensation shall be determined by a commission of three persons appointed by it. * * *"

In construing the rule we stated in the Buhler case [254 F.2d 879]:

"* * * as prescribing trial by jury as the usual and customary procedure to be followed, if demanded, in fixing the value of property taken in condemnation proceedings, and as authorizing reference to Commissioners only in cases wherein the judge in the exercise of a sound discretion based upon reasons appearing in the case finds that the interests of justice so require."

Here the government, as plaintiff, made a jury demand. The court, on its own motion, appointed the commissioners, citing as reason therefor only "because of the character, location and quantity of the land and improvements being condemned." Thereupon the United States filed a motion to revoke the reference and to submit the case to a jury. After a hearing on this motion the statements of the trial court indicate that it considered the large number of rental units and the variety of other improvements made the valuation of these leaseholds a complex problem, because, as he said, "you have several million dollars worth of property with several hundred houses of different types and character, you have different rentals, you have a town in itself." : However, the court did not make any finding of fact as a basis for his conclusion that either the character, location, or quantity or for any other reason "in the interest of justice" this condemnation proceeding should fall in the exceptional class to be taken from a jury.

At the time of the reference this Court had not decided that reproduction cost less depreciation was not a relevant consideration in arriving at value, Fort Benning Housing Corp. v. United States, supra. In the Fort Benning case the trial judge admitted evidence of reconstruction cost, and the condemnees here introduced such evidence, although the commissioners did not act upon it. If such costs and the rates of depreciation applying to each type of improvement were relevant facts to be considered in such a case, it is less difficult to see why the trial court here felt the property to be of such a character as to warrant submission to commissioners. With the question of reproduction cost and depreciation out of the case, it is evident that there was nothing in this record that would warrant referring this condemnation case to commissioners. There was in effect a single 124-acre community wholly within the Fort Bliss military reservation. There was no question of highest and best use, since the nature of the improvements was fixed for the life of the lease. It could be used for nothing but what it was now dedicated to. Proof of value must be of three kinds: (1) The cost of the project—a single total figure easily testified to before a jury; (2) capitalization of anticipated income —The anticipated income would necessarily be based on actual experience, one easily proved by an annual figure of gross rentals less expenses of operation and less carrying charges for mortgage payments multiplied by the anticipated life; it would make no difference whether such gross rents came from 200 two-family houses or 400 one-family houses because it is the dollar figure alone that is to be computed and then valued as of the date of taking, using a correct rate of return in making the computation; (3) proof of comparable sales is made by evidence

of the sales price of property "considered" or "judged" to be comparable. It is traditional that the question whether the compared property is truly comparable is for the judge to decide. Once he decides the property is comparable enough to support the witness's opinion, it becomes the duty of the fact finder to weigh the opinion against that of others.

The failure of the commissioners here to comprehend the true nature of their duties, as evidenced by their departure from known and accepted standards of valuation and their complete failure to recognize and apply rules of evidence during the hearing, making it impossible for the trial court or this Court to determine whether its findings were based on legally admissible evidence, and its failure to make adequate subsidiary findings of fact emphasize the reason for the rule that reference to a commission is the exception and not the rule.

A jury trial at which the trial judge promptly rules on the admissibility of proffered testimony and then narrows the issue by appropriate charge to the jury may, indeed, frequently simplify even what appears to be a complex valuation problem.

Since the issue of value of this single tract of land is easily manageable by presentation of testimony of cost, opinion evidence of what is a fair rate of return on factually provable net income, and combined factual and opinion evidence as to comparable sales, if any, this is not such a case as warranted submission to a commission under Rule 71A(h). United States v. Theimer, 10 Cir., 199 F.2d 501.

The findings of value of the trial court, based as they were on an acceptance of findings and conclusions of the commissioners, are not supported by substantial evidence and they are, therefore, clearly erroneous. They are reversed and the case is remanded for trial in the conventional form by a jury.

Reversed and Remanded.