**FAIRFIELD GARDENS, INC., a California corporation, et al., Appellants,**

v.

**UNITED STATES of America,
Appellee.**

**UNITED STATES of America,
Appellant,**

v.

**FAIRFIELD GARDENS, INC., a California corporation, et al., Appellee.**

**No. 17300.**

United States Court of Appeals
Ninth Circuit.

June 27, 1962.

See also 21 F.R.D. 370.

**168**

Breed, Robinson & Stewart, and Bestor Robinson, Oakland, Cal., for appellant.

Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, A. Donald Mileur, Attorneys, Department of Justice, Washington, D. C., Cecil F. Poole, U. S. Atty., Charles R. Renda, Asst. U. S. Atty., and J. Harold Weise, Attorney, San Francisco, Cal., for appellee.

Before ORR, BROWNING and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

These are cross appeals by the condemnee (Fairfield) and by the government in an action brought by the government to condemn Fairfield's leasehold interest in two so-called Wherry housing projects located at Travis Air Force Base, Solano County, California. We conclude that the judgment should be affirmed.

The projects in question were constructed under the Wherry Act (12 U.S.C.A. §§ 1748–1748h), the government owning the fee, and the property being leased to Fairfield (see 12 U.S.C.A. § 1748d, as enacted in 1949, 63 Stat. 570) for 75 years from March, 1951. When the Wherry Act was superseded by the Capehart Act, 69 Stat. 646, provision was made for acquisition by the government of Wherry projects (42 U.S.C.A. § 1594a, 69 Stat. 652) and in 1956 such acquisition was required, by condemnation if necessary, whenever, as in the present case, a Wherry project is located at or near a military installation where construction of a Capehart project is authorized (42 U.S.C.A. § 1594a(b), 70 Stat. 1019, 1111). Here, the government sought to condemn the leasehold of Fairfield, subject, however, to the outstanding mortgages incurred when the project was constructed.

### FAIRFIELD'S APPEAL

1. *The matter of rent controls.*

In submitting the matter to the jury, the court told them, in substance, that they should take into account the rent controls to which the project was subject.[1] In its pre-trial order, the court

1. "In considering any valuation by the capitalization-of-income method, you shall consider the existing laws and regulations about which I will instruct you, or which have otherwise been introduced in this case, which limit the net income that may be received from the project. You shall also consider the terms and conditions of the leases from the Government to the defendant corporation and any and all contracts and agreements entered into by the corporation that may affect rental income and the operation of the project. These factors, and all similar matters, must be considered by you in arriving at your award of just compensation.

\* \* \* \* \*

"With respect to the question of rent control as to the project herein involved, the legal effect of all the contracts and agreements entered into by defendant corporation and of all the pertinent statutes and governmental rules and regulations is that the project rentals were subject to approval or control by the Government, either through the Federal Housing Administration or the military, during the entire 75-year period herein involved, re-

had ruled that experts must consider the same matter.[2] These rulings are assigned as error.

There was no error. Because the Wherry Act held out certain inducements to builders and operators of projects, and because an objective of the Act was, among other things, to furnish low-cost military housing (see S. Rep. 231, 85th Cong., 1st sess.) the government imposed rent controls and other controls upon the operators (here, Fairfield). The method of control was by ownership of preferred stock in Fairfield (see 12 U.S.C.A. § 1748b(b) (1) ). Fairfield's Articles of Incorporation imposed certain restrictions upon its operation, so long as the mortgage insured under the Act was in effect. This would be until 1985. Until that time, maximum average rental per room per month fixed by the Board of Directors had to be approved by the holders of the preferred stock, and the Federal Housing Commissioner held that stock, which was not redeemable while the mortgage continued in effect. Thereafter, presumptively beginning in 1985, the lease provided that the rents were to be such "as are agreed upon from time to time by the said commanding officer and the lessee." It is conceded that there was no means by which Fairfield or any person who might succeed it could escape from these controls during the life of the lease.

Fairfield claims that, until 1985, the rent limitations are not provided for in, and are not part of, the lease. Therefore, it concludes, the leasehold interest, which is being condemned, is not subject to such restrictions until 1985, a date too remote to be material. The claim is specious. The formation of Fairfield, the approval of its capital structure, the commitment to insure the mortgage, the rent restrictions in its

gardless of who the owner of said leasehold estate might be.

"Field Letters issued by the Federal Housing Administration to its field offices are not regulations and they do not have the force of law. They represent interpretations by a government official or policies which may be changed from time to time.

"The Articles of Incorporation, which constituted an agreement among (1) the corporation, (2) its common stockholder at that time, and at that time it was the National Engineering & Development Corporation, and (3) its preferred stockholder, the Federal Housing Commissioner, provided that the schedule of rents— that is, the Articles of Incorporation provided that the schedule of rents initially fixed by the Board of Directors and approved by the Federal Housing Commissioner, would remain in effect until an increase was approved by the Commissioner. No authority was granted to the Commissioner by the Articles of Incorporation or any other contract documents to reduce the rents of these dwelling units.

"In fixing just compensation, you are entitled to assume that, as economic conditions change, the federal officers having the power to approve rental schedules will from time to time consider changes in economic conditions and will act fairly and reasonably in passing on any proposed change in rental schedules."

2. "In arriving at market value, the expert witness must consider the effect on market value of all limitations and benefits under which the condemned property was constructed and operated.

\*　　\*　　\*　　\*　　\*

"Nor may the expert valuation witnesses of either party utilize market rents as the sole basis for his capitalization of income.

\*　　\*　　\*　　\*　　\*

"3. Neither replacement cost, with appropriate adjustment for depreciation, capitalization of net income, including capitalization of net income based on the schedule of rents as of the date of taking, or capitalization of income based on rents from comparable property in the vicinity are, standing alone, direct evidence of market value.

"Such lines of evidence constitute approaches and factors which may be considered by prudent sellers and purchasers and may be utilized and analyzed as a basis for opinion of market value by qualified experts.

"4. The expert witnesses are entitled to assume that as economic conditions change, the federal officers having the power to approve rental schedules will from time to time consider changes in economic conditions and will act fairly and reasonably in passing on any proposed change in rental schedules."

charter, the purchase of preferred stock, and the making of the lease were in substance all part of one transaction, having a single aim in view. All of them must be construed in the light of the statute and the regulations issued under its authority. Since a purchaser of the lease would remain subject to the controls, even though they are not set out in the lease document, he would obviously take the controls into consideration. It seems equally clear to us that such consideration would affect the price he would pay. Under the principles laid down in Olson v. United States, 1934, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236, the court below was right.

If Fairfield had had the right to transfer the lease, free of rent controls, we would have a different question, and the cases upon which Fairfield relies might apply (see Omnia Commercial Co. v. United States, 1923, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773). But here the only property interest condemned is admittedly irretrievably subject to the controls. The Constitution does not require a disregard of the state of the title. (Boston Chamber of Commerce v. City of Boston, 1910, 217 U.S. 189, 195, 30 S.Ct. 459, 54 L.Ed. 725).

Fairfield also claims that the court's ruling is unconstitutional under Amendment V to the Constitution. The theory seems to be that, because the power to limit rents is in government officers, and because the government is the condemnor, the government is thus enabled to determine just compensation. This contention, we think, is without merit.

The rent control provisions were part of a transaction into which Fairfield voluntarily entered. As we have already held, the existence of these controls does affect the market value of the rights being obtained. But this does not entitle Fairfield to any more than the market value of the property being taken. All kinds of governmental action may directly affect the value of property, such as wartime price or rent controls, zoning regulations, etc. Yet we know of no case—and Fairfield cites none—holding that the fact that such controls or restrictions are imposed by the same government that seeks to condemn requires that they be disregarded in determining market value. Cf. United States v. Felin & Co., 1947, 334 U.S. 624, 68 S.Ct. 1238, 92 L.Ed. 1614; United States v. Commodities Trading Corp., 339 U.S. 121, 70 S.Ct. 547, 94 L.Ed. 707. In those cases, the controls were temporary, and applicable to all buyers and sellers. Here, they are a permanent part of the very interest condemned, specifically agreed to by Fairfield when it went into the deal. Moreover, the court was careful *not* to say that the rent controls fixed the market value; it said only that the jury should consider them as affecting that value. A different question might be presented if it were shown that, in anticipation of condemnation, the government's agents had deliberately set the rents at an unjustifiably low level. There is no such claim here.

2. *The construction cost and purchase price of the Capehart project.*

The time of taking in this case was October 31, 1957. At that time, there was being constructed at Travis Air Force Base a so-called Capehart project, under the authority of the Capehart Act, 69 Stat. 646. This Act provides, in substance (Sec. 403, 69 Stat. 651) for the construction, on government land, for government use and ultimate ownership, of urgently needed military housing. The court ruled that neither evidence of the purchase price nor of the construction cost of the Capehart project was admissible in this case.

The court was right. Such a construction contract is not a comparable sale, nor would the cost of that project be material in determining the market value of the lease here involved. Apparently Fairfield does not take the point seriously; it has not brought up the portion of the record in which its offer of proof was made, but only the pre-trial order containing the court's ruling stated above.

*THE GOVERNMENT'S APPEAL*

1. *The matter of comparable sales.*

In pre-trial proceedings, the court heard the testimony of the government's

sole witness as to comparable sales, Mr. Robert C. Hastings. The sales that he had studied involved the following: Wherry projects at Barksdale Air Force Base, Shreveport, Louisiana, Quantico Marine Training Station, Virginia, and Fort Devens, Ayer, Massachusetts, and so-called 608 projects [3] at Fairmont Gardens and Claremar Apartments, San Diego, California; and Hampton Gardens, St. Louis, Missouri, and Hillsdale Apartments, San Mateo, California.[4]

The witness testified that the factor which determined comparability, both as to Wherry projects and 608's, is "property which will produce a similar flow of income". He further stated that location has very little effect on the prospective purchaser, that half of the 42 Wherry projects with which he was familiar[5] had non-resident owners, that equity investments tend to follow mortgage capital, and that physical similarities and differences generally have no bearing on comparability. His opinion was that FHA minimum property requirements and maximum limitations on the size of the unit produce a similarity in construction standards. Type of construction (brick, frame, stucco on block, etc.), he felt, would have little bearing on a determination to buy.

He then gave a fairly detailed description of one Wherry project, Barksdale A. F.B., but not of any of the others. All sales that he proposed to use were of the stock of the project corporation, not of the underlying lease (in the case of Wherry projects) or fee (in case of 608's). He made certain adjustments for this. He also said that in all of the sales he used, there was a definite pattern of income-price ratios.

On cross-examination, it was shown that the physical characteristics of each Wherry project, i. e., the type of construction, the location, the proximity to other communities (and thus the probable availability of other tenants if the base were inactivated or closed), the size and character of such communities, the number of units, the times of sale, and vacancy factors, were different. It was also shown that, in the case of 608's, they were in different and mostly distant areas, were owned in fee, were subject to no preference for military occupancy, and rent limitations applied only during the life of the mortgages.

Government counsel then made an offer of proof.[6] The court ruled that it

3. These are projects carrying mortgages insured under § 608 of the National Housing Act as amended (56 Stat. 303, as amended, 12 U.S.C.A. § 1743). The record is almost completely barren of any evidence as to the physical character, cost, rent schedules, type of tenancy, precise location, or anything else about the projects mentioned by the witness. They are subject to rent controls analogous to those imposed under the Wherry Act (see 12 U.S.C.A. § 1743(b) (1)), and preferences in occupancy must be given to veterans of World War II and their immediate families (see 12 U.S.C.A. § 1743(b) (2)).

4. The witness also mentioned Woodclip Gardens, North Bergen, New Jersey, Taconic Gardens, The Bronx, New York, and Truman Town House, La Jolla, California. However, counsel withdrew the offer as to these.

5. There are some 200 Wherry projects at 83 locations.

6. "Mr. Hastings, and other Government witnesses, if permitted to testify on the comparable sales, would testify that the Barksdale Air Force Base, 100 per cent of the stock, and with adjustments to determine the consideration paid for the so-called equity, that is, the leasehold subject to the mortgage with adjustments, for corporate assets and replacement-reserves, would testify that the sale took place on March 8, 1954 and the consideration attributable to the leasehold interests with the adjustments I mentioned would have been $230,097.23.

"The testimony on the Quantico, Virginia Marine Base, the sale October 3, 1955, also with the same adjustments as for Barksdale, would have been $200,-008.00.

"The testimony on the consideration at Fort Devens Army Base, the sale March 31, 1956, and on the same basis, would have been $188,937.00.

"On projects financed with mortgages insured under FHA statute, Section 608,

would exclude the evidence, saying:

"the basis of my ruling and the underlying purpose behind it was to rule that these sales that were mentioned are simply not in a geographical area which can be comparable to the Fairfield-Suisun area in California, and the Travis Air Force Base area.

"They differ climatically, they differ on population patterns, they differ economically, they differ in a number of ways.

"For that reason, and because they deal with interests in real estate I have ruled that they are not comparable."

It gave the government an opportunity to offer further evidence, as a foundation. The offer was declined. The pre-trial order excludes this type of testimony.[7]

The government concedes that the admission or exclusion of such evidence is within the sound discretion of the trial judge. (Richland Irrigation District v. United States, 9 Cir., 1955, 222 F.2d 112, 117). Essentially, its position is that the court abused its discretion, although what it says is that the court below misunderstood a rule of law.

The government's theory is that there exists a single, national market for Wherry and 608-type housing projects, regardless of differences in their location, size, construction, and other differences, and even, apparently, regardless of the date of sale, and that the sole criterion of value in that market is capitalization of income at a substantially uniform rate. If there be such a market, we cannot take judicial notice of the fact, and we do not think that, fairly considered, Mr. Hastings' testimony shows such a fact. In the field of real estate valuation it has long been the rule that sales of other property are not admissible unless the other property is comparable.

would have been Fairmont Gardens, San Diego, California, the sale March 11, 1957, 52 units, $57,522.00.

"The testimony with respect to Claremar Apartments, San Diego, California, sale April 8, 1954, $236,532.00.

"The sale of Hillsdale Apartments, San Mateo, California, April 1, 1957, 705 units sold by David D. Bohannon to the National Engineering Development Corporation, headed by Mr. Albert G. McCarthy, Jr., the sale was made in consideration of a loan to the corporation of $100,000.00, which loan is repayable by the corporation, and a $25,000.00 noninterest bearing note.

"Mr. Hastings and the other Government witnesses, if permitted, would testify to the foregoing and other similar sales, which the Government contends are sales of comparable interests and comparable properties, would testify that the prices paid in such transactions, and with adjustments, for comparison with the subject property, would have bearing upon and be indicative of the fair market value of the subject property, and that a prospective purchaser for the property interest being condemned in the subject property would consider such sales and similar sales in arriving at a price to be paid, for the leasehold interest, subject to the mortgage.

"They would further testify that the said sales and other similar sales would substantiate their opinions of value of the leasehold interest subject to the mortgage, arrived at by other methods of appraisal."

7. "A. Comparable Sales. Both parties hereto have attempted to lay a foundation for sales of similar interests in various locations throughout the country and the Court has ruled such sales inadmissible as comparable sales in that the geographic locations of plaintiff's proffered sales were too remote from the instant property, and the so-called Capehart sale offered by defendant was too dissimilar in subject matter. For the purpose of expediting this proceeding and protecting the record of the respective parties, the Court's rulings with respect to these proffered sales and the respective offers of proof by the parties, will be deemed as if made during the trial proper, and it will be unnecessary for either party to reoffer the sales in question or to restate their offers of proof. No further evidence of comparable sales will be received, since the parties were offered the opportunity to present such evidence during the pre-trial conferences and preliminary hearings.

\* \* \* \* \*

"The transactions heretofore ruled out by the Court as comparable sales shall not be testified to on direct examination by witnesses for either of the parties in the capitalization-of-income approach."

And comparability, while it does not mean identity, because each parcel of real property differs from every other parcel, does mean, at the very least, similarity in many respects. Here, the dissimilarities seem to us far more striking than the similarities. Under these circumstances, we do not think that the court abused its discretion in excluding the evidence. Whether, on the basis of a more complete and convincing showing, another court would be acting within its discretion in admitting such evidence, or would abuse its discretion in excluding it, we leave until such a case arises. The government had ample opportunity to make such a showing here, but did not do so. It did offer Mr. Hastings as a witness, and elicited his opinion based upon a capitalization of income, but under the court's ruling, excluding his testimony as to comparable sales. It presented another witness (Mollan), who testified, in part, on the same basis.

The cases that the government cites do not require the admission of the rejected testimony. In United States v. Benning Housing Corporation, 5 Cir., 1960, 276 F.2d 248, testimony as to the same three Wherry project sales was admitted, but this was not assigned as error. In United States v. Leavell & Ponder, Inc., et al., 5 Cir., 1961, 286 F.2d 398, similar testimony was admitted, but again, this was not assigned as error. The court there says that it "held" such evidence admissible in Benning Housing. This is obviously incorrect. No other case cited involves a similar situation.

2. *The matter of reproduction costs.*

Much evidence was admitted as to reproduction cost of the project. This matter had also been considered at pre-trial, and the court, in its pre-trial order determined that reproduction cost could be shown and considered by the experts, but only as a factor to be considered in arriving at market value, and not as itself evidence of market value.[8] It instructed the jury along similar lines.[9]

The witnesses for Fairfield gave reproduction cost figures varying from $13,427,000 to $12,163,000, before depreciation. The government, without waiving its objection, presented witnesses whose figures varied from $8,942,000 to $8,286,000. Each witness also gave figures for depreciation. The parties' witnesses' opinions as to market value of the interest taken, subject to the mortgage, were arrived at by various methods, and, in each case, using repro-

---

8. "2. The following factors may be presented to the jury as being probative of market value:

"Any factor which in the opinion of the expert testifying would affect the market value of the interests condemned and would, therefore, be considered by the hypothetical, prudent purchaser. These factors may include, but are not limited to, any evidence of sale prices in comparable sales, capitalization of income methods, and replacement cost with appropriate adjustments for depreciation.

&ast; &ast; &ast; &ast; &ast;

"C. Replacement cost. Either party may offer evidence under the method of replacement cost less depreciation as of the date of taking, for the purpose of corroberating and sustaining the evidence of the expert valuation witnesses as to market value."

See also footnote 2, supra.

9. "You have heard testimony from expert witnesses of both parties as to the cost of replacement, less depreciation of the condemned property on the date of the taking. The purpose of that testimony is to show what it would cost to reproduce or replace the property condemned which was constructed by the defendant several years prior to the date the United States took the property. Such evidence of replacement cost is not, standing alone, direct evidence of market value. However, both the plaintiff and the defendant were entitled to offer this evidence of replacement to corroborate and sustain the opinion as to the market value of the condemned property which they presented through their valuation witnesses.

"Replacement cost, or reproduction cost, may be considered only when proper deductions are made for physical depreciation and obsolescence. Moreover, replacement cost, or reproduction cost less depreciation, may be considered only when there has been a showing that a reasonable, prudent person would reproduce the projects on October 31, 1957, for the figure or amount given as replacement or reproduction cost."

duction cost only as an element considered, or a "check" on their valuations. The market value opinions varied almost as strikingly as the reproduction cost figures. Fairfield's witnesses said $3,435,-000 and $3,191,000; the government's, $397,000 and $229,000. The verdict was for $1,250,000.

■ The government says that reproduction costs are not admissible in evidence in such a case as this. Its principal reliance is upon United States v. Benning Housing Corporation, supra, C.A. 5, 1960, 276 F.2d 248, followed in United States v. Leavell & Ponder, Inc., supra, C.A. 5, 1961, 286 F.2d 398 and Buena Vista Homes, Inc. v. United States, C.A. 10, 1960, 281 F.2d 476. The cases cited do not support so strong a position as the government urges. In Benning Housing, supra, reproduction cost was admitted by the trial court as direct evidence of market value. The court there said "Where a market value is not established, it is the primary responsibility of the trial court to determine whether reproduction cost evidence should be admitted as an aid to valuation. Here, the trial court ruled that it should and we cannot say that that decision was an abuse of discretion". (276 F.2d at p. 251.) Moreover, in the case at bar the court carefully instructed the jury that reproduction cost is not direct evidence of market value, and that it may be considered only when there has been a showing that a reasonable, prudent person would reproduce the project, on the valuation date, for the amount given as reproduction cost.[9] So far as appears, no such instructions were given in Benning Housing.

The reversal in Benning Housing was grounded solely upon the court's conclusion that the controlled rate of return for Wherry projects is based solely on original cost, so that reproduction cost, in an inflationary period, can never be a factor to be considered in valuing such a project. Neither the statute nor the regulations require that the rate of return be based solely on original cost, although up to now that has been the practice, and there is nothing in the record before us indicating that rents will necessarily be controlled, during the life of Wherry projects, on so fixed a basis. We therefore do not think that the Benning Housing case is controlling in a case such as the one before us, where the Court carefully limits the use of reproduction cost. What the Court did here is not contrary to the views we expressed in Carlstrom v. United States, 9 Cir., 1960, 275 F.2d 802, 808. See, also, United States v. Johnson, 9 Cir., 1960, 285 F.2d 35, 39, note 2. As we pointed out in that case, it makes a material difference whether evidence is received as direct proof of value, or as background for the expert's opinion as to value. Here, the experts for Fairfield gave market value figures substantially *less* than their figures as to depreciated reproduction costs, while both government witnesses gave market value figures *greater* than their depreciated reproduction cost figures!

The government urges that the evidence as to reproduction cost, presented by Fairfield, was so extensive and detailed that it must have "brainwashed" the jury, thereby producing an excessive award. We recognize that this is a danger; we do not think that it occurred here. Fairfield's reproduction cost figures, like its market value figures, were offset by very different figures offered by the government. Each valuation witness testified, in substance, that while he considered reproduction cost, or used it as a check, he arrived at his valuation by considering many other matters as well, and particularly, the income to be expected and his capitalization of it. Thus, the court's rather brief instruction on reproduction cost [9] fitted the testimony as given. The verdict indicates to us that the jury was not "brainwashed". We find no reversible error.

Affirmed.

9. See note 9 on page 173.