322 F.2d 698
 UNITED STATES of America, Appellant,
v.
MICHOUD INDUSTRIAL FACILITIES and Board of Commissioners of the Port of New Orleans, et al., Appellees.
MICHOUD INDUSTRIAL FACILITIES and Board of Commissioners of the Port of New Orleans, et al., Appellees
v.
UNITED STATES of America, Appellant.
 No. 18837.
 United States Court of Appeals Fifth Circuit.
 August 22, 1963.
 
 Harold S. Harrison, Roger P. Marquis, Attys., Dept. of Justice, Ramsey Clark, Asst. Atty. Gen., Washington, D. C., Kathleen Ruddell, U. S. Atty., New Orleans, La., Norton L. Wisdom, Asst. U. S. Atty., New Orleans, La., M. Hepburn Many, U. S. Atty., New Orleans, La., for appellant.
 A. J. Waechter, Jr., of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Krim-Ko Corp.
 James H. Drury, Peter L. Bernard, Jr., New Orleans, La., for defendant-appellee The Southland Engineering Corp.
 Lewis, Rice, Tucker, Allen & Chubb, Abe Garland, St. Louis, Mo., Monroe & Lemann, Malcolm L. Monroe, Jerry A. Brown, New Orleans, La., for Laclede Steel Co.
 Phelps, Dunbar, Marks, Claverie & Sims, Sumter D. Marks, Jr., New Orleans, La., Barnes, Hickam, Pantzer & Boyd, Louis A. Highmark, Indianapolis, Ind., for defendant-appellee Claude A. Staats & Son, Inc.
 Leonard B. Levy, New Orleans, La., for defendant-appellee Schaller Steel Works, Inc.
 Dufour, St. Paul, Levy & Marx, Henican, James & Cleveland, Murray F. Cleveland, New Orleans, La., for defendants-appellees B. & H., Inc., and Stewart-Duravan Co.
 Deutsch, Kerrigan & Stiles, New Orleans, La., for appellees Cloar Glass Co., Inc., Ralph L. Kaskell, Jr., New Orleans, La., of counsel.
 George R. Blue, A. J. Schmitt, Jr., New Orleans, La., for defendants and appellees The Panel-Ette Corp. and Jack A. Wilson and Associates.
 Beard, Blue, Schmitt & Treen, Louis M. Jones, New Orleans, La., for defendant-appellee Industrial Food Machinery Co.
 Sumter D. Marks, Jr., Herbert S. Weil, Emero S. Stiegman, Peter G. Burke, New Orleans, La., for appellee and cross-appellant Bd. of Comrs. of Port of New Orleans. Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., of counsel.
 Before TUTTLE, Chief Judge, and RIVES and BROWN, Circuit Judges.
 TUTTLE, Chief Judge.
 
 
 1
 There is here in issue the correctness of the determination by the trial court, based upon the awards made by commissioners, of the values of three different types of interests resulting from the condemnation by the United States of the 1,000.22-acre tract of land, and 22 buildings comprising the Michoud Industrial Facilities in New Orleans, Louisiana. The three takings, giving rise to the need for three types of valuation, occurred as follows:
 
 
 2
 Effective May 1, 1951, the Government took possession of all but one building (the Laclede Steel Company Building) and all of the land comprising the Michoud facilities. It took possession initially under a taking of a leasehold for the entire property to December 23, 1952, extendible to June 30, 1975. This required valuation of this right of possession from May 1, 1951 to December 23, 1952. By Amendment, filed in February, 1952, the Government took the entire leasehold estates of the tenants, for whatever period they were to run. This required a valuation of the several leaseholds from the May 1, 1951 date of taking possession. Finally, on December 23, 1952, the Government filed an Amendment taking the fee of the property. This, of course, required a valuation of the fee[1] as of December 23, 1952.
 
 
 3
 A brief history of this property will aid in a discussion of the appeal.
 
 
 4
 The property, consisting of 1,000.22 acres of land and improvements, while within the city limits of the City of New Orleans, abutting on the United States Highway 90 from New Orleans to Mobile is approximately 13 miles east from downtown New Orleans. Much unimproved and undeveloped land lay between the built-up city and this tract. It is bounded by two canals, the Intracoastal Canal on the south and the Michoud Canal on the east. It is served by rail connections, with the main line of the Louisville and Nashville Railroad at the extreme northeast side of the property. The tract was originally acquired by the United States in 1942 on behalf of the Defense Plant Corporation for the construction of a shipyard. At that time the land was marshy and subject to tidal overflow, but it was filled and graded and drainage was provided. The industrial plant, which had cost the United States approximately $17,721,000, was completed in 1944. During the period of construction the purpose of the plant was changed from ship building to the fabrication of aircraft. This effort was equally abortive and no aircraft were built, so that by the end of the Second World War the plant stood as a monument to the inefficiencies of waging a war which requires tremendous industrial construction before production of war essentials can be undertaken.
 
 
 5
 At the end of the War, the property was declared surplus. Extensive efforts were made to dispose of it without success. In November, 1947, it was sold, together with all machinery, equipment, tools, furniture, fixtures, and other personal property located thereon, to the Board of Commissioners of the Port of New Orleans, which, for convenience, we refer to herein as the "Dock Board."
 
 
 6
 The contract of sale called for the payment of $9,506,541, with no cash down, and the total consideration to be paid only from rents and profits which the Dock Board might receive for fifteen years. The property consisted of 22 buildings and 16 other installations, including some trackage, sewerage facilities, airplane runways, docks, parking lots, etc. The buildings themselves covered approximately 50 acres. Much the largest and most important facility was a main manufacturing building more than a quarter of a mile in length, with ceiling heights from 48 to 55 feet. Other important buildings were a two-story administration building, 837 feet long, and a two-story engineering building, 1157 feet long.
 
 
 7
 Because of the bearing on the outcome of the appeal of underlying legal questions, we conclude that it is not necessary to make a more specific or accurate description of the facilities and land that were subject to valuation. These legal problems arise from the peculiar circumstances: (1) that the 1,000.22-acre tract with such a tremendous complex including buildings of truly gargantuan size, which must be valued as a whole by determining its fair market value, does not really have any comparables in the market on which expert opinions of valuations can be based; (2) that the very size and nature of the improvements so narrowly limit the potential market of those who might be ready, willing and able to acquire and use the property for which it was most ideally suited that, according to the principles announced by this Court in United States v. Benning Housing, 5 Cir., 276 F.2d 248, the cost of reproduction, less depreciation, cannot be used as an aid to valuation; and (3) the fact that within a few months of the date of taking on May 1, 1951, of all of the unleased space, there was approximately 1,767,000 square feet of space in these buildings then being offered to the public by the Dock Board for long term leases at rentals of approximately 20 cents per square foot per year and more than 700 acres of raw land being offered at $200 to $350 rent per annum, is so indicative of the lack of demand and the lack of the rental possibilities of the property as to completely dominate, if not absolutely control, the income factor in any capitalization formula for arriving at the fair market value of the property as of May 1, 1951; there is also the fact that on December 23, 1952, any hypothesis dealing with an assumption that there would be a purchaser ready, willing and able to buy from a seller, ready, willing and able to sell, must include the fact that these buildings with 1,767,000 square feet of floor space would hang over the New Orleans market for similar factory and warehouse space to such a degree that it must also be considered to have a dominating, if not an absolutely controlling place in determining the market value of the fee as of that date on any valuation based on capitalization of income. Finally, there is the circumstance that the lack of available space for the tenants to lease when their leasehold interests were taken by the May 1, 1951 condemnation was directly attributed to the contemporaneous taking by the Government of all of the unoccupied space in the Michoud buildings.
 
 
 8
 On May 1, 1951, there were 32 lessees of part of the property, much the greater part of whom held space in the tremendous main manufacturing building, but some of whom had entire buildings or space in the office building and the engineering building. The latest of these leases to be executed had been signed as recently as January, 1951. One of these January leases was for 4,200 square feet of space in the main manufacturing building for a term of nearly five years at 20 cents per foot; one of them was for 45,300 square feet of space in the manufacturing building for a term of 10 years at 20 cents per square foot; another was for 6,400 square feet in what is known as the office or administration building for a term of ten years at 25 cents a square foot. All of these leases were in conformity with a published rate schedule of the Dock Board dated May 1, 1950, which offered nearly 1,500,000 feet of space in the main manufacturing building at 20 cents per foot for terms of from 5 to 25 years and offered some 40,000 square feet in the office building at 30 cents per square foot for office use and at 25 cents per square foot for light manufacturing. It also offered 60,000 square feet in the engineering building at 30 cents per square foot for office space and 25 cents per square foot for light manufacturing space.
 
 
 9
 In the same schedule published by the Dock Board as of May 1, 1950, the rental rates for the vacant land were $200 per acre per year for 400 acres, neither on canals nor roads, $300 per acre per year for lands adjacent to canals and roads, $300 per acre per year for land adjacent to paved roads only and $350 per acre per year for 15 acres that were paved. The only acreage leases in effect were one for two acres entered into April 15, 1950 at $350 per acre and one for one acre entered into in January, 1951 for $300 per acre.
 
 
 10
 The main thrust of the Government's argument here is that there was so much building space available in the three principal buildings owned by the Dock Board (from 85 to 95 per cent of the total space according to the particular building) and so much vacant land in the tract offered to the public for rent at an average price per square foot of a little over 20 cents per year for the building space and an average rental of $300 per year for the land that for all valuation purposes as to the three different takings involved here, these rentals at which the property was being offered to the public up to January 15, 1951, were either controlling as a matter of law or they were so overwhelmingly dominant in light of the then existing conditions as to make any different finding of valuation clearly erroneous. Applying the Government's contention throughout, thus giving the quoted prices of the property the effect of completely controlling the market value, with a few modifications upward to meet certain specific situations, would produce a total award for the Dock Board's interests of less than $6,000,000. This is contrasted with opinion evidence by witnesses for the Dock Board of $24,500,000 to $22,325,695, and an award by the Commission of $14,322,234 for the fee interest as of December 23, 1952. Likewise the Government's approach would produce a nominal valuation only for the cancellation of the leases of the tenants, based principally on the loss to them of improvements in their leased space, as contrasted with valuations of some $800,000 arrived at by the tenants' expert witnesses and an award by the commissioners to the tenants of $703,293.02, representing the value of their leases above the rentals they had agreed to pay to the Dock Board.
 
 
 11
 We have carefully read the record so far as germane to these principal contentions of the parties and it is apparent that in all of the opinions as to value testified to by the witnesses for the Dock Board and the lessees, they ignored or undertook to explain as irrelevant both the rental rates being paid by the lessee, the fact that the leases had been made in some instances just three months before the first taking and the fact that there would be over 1,767,000 square feet of similar space available on the market both as of the date of the taking of the unoccupied space from May 1 to December 23 from the Dock Board and as of December 23, 1952, the date as of which the value of the fee in the Dock Board was to be arrived at. Of course, also, the witnesses discarded as irrelevant to the valuation of May 1, 1951, the date on which the lessees' interests were to be valued, the fact that the Dock Board had up to January 1951 been offering this tremendous unused space for rent at an average a little above 20 cents per square foot.
 
 
 12
 We think it is equally plain from reading the 255 page report by the Commissioners that they disregarded these same facts and they based their findings of values on hypotheses used by the various appraisal experts which excluded any assumption as to the existence of the 1,767,000 square feet of vacant space. Since we conclude that the failure of the expert witnesses to take this factor into consideration destroyed the value of the testimony and conclude also that the commission erred in excluding this fact from its consideration in arriving at the valuations, we will first discuss this feature of the case.
 
 
 13
 No authority need be cited for the proposition that in a condemnation proceeding such as that here before the Court the owner of the property taken is entitled to just compensation and that within the meaning of the Fifth Amendment to the Constitution just compensation is the fair market value of the property at the time of taking contemporaneously paid in money. It is equally understood by all courts dealing with the matter that "in determining this value, the highest and most profitable use for which the property is adaptable and needed, or is likely to be needed in the near future, is to be considered." Cameron Development Co. v. United States, 5th Cir., 145 F.2d 209.
 
 
 14
 THE TAKINGS FROM THE DOCK BOARD.
 
 
 15
 Turning our attention first to the property of the Dock Board that was taken, we find this to have been taken by the Government in two separate steps. The first step was the taking on May 1st, 1951 of a leasehold interest until December 23, 1952, in all of the unoccupied space in the buildings and all of the unoccupied acreage of raw land; the second being the taking on December 23, 1952, of the fee title of the Dock Board in the same property; that is, the entire right, title and interest which the Dock Board owned; which of course excluded the leasehold estates held by the tenants as of that date. As to these two takings, it was clearly erroneous for the expert witnesses upon whose testimony the Commissioners relied so strongly and for the commissioners themselves to disregard the undoubted fact that a hypothetical purchaser of the leasehold interest of all of the unoccupied property from May 1, 1951, to December 23, 1952, would have made his offer for the property in light of the fact that he would be buying 1,000.22 acres of land and buildings having 1,767,000 square feet of rentable property, which up until 3 months previously had not appealed to the prospective users of such space at a rate of a little more than 20 cents a square foot. It, of course, makes no difference that on May 1, 1951, this large area of usable space was not actually on the market to be rented because of its having been removed by the Government. What the court has to do as of May 1st is determine what the hypothetical purchaser would pay to a hypothetical owner of the leasehold interest both being in the market without being under any compulsion to buy or sell. Such hypothetical parties would necessarily have in mind that here is a thousand acre tract with 22 buildings and many other installations which must be valued as a whole with all of its advantages and disadvantages, and it must be valued as of that date in light of existing opportunities for investment. If, instead of 1,700,000 square feet of vacant space, there had been a few hundred thousand feet which the Dock Board was still offering at 20 cents a square foot we would say it would still be necessary for the Commissioners to give some consideration to the fact that rentals would still be made at 20 cents, since no matter what caused the price of 20 plus cents per square foot to be fixed it was obvious that the available space had not all been taken at that price. Such rental price would therefore be the best proof of the going market value as of the time the last leases were made in January.
 
 
 16
 Where, as was here the case, some 85 per cent of the entire building space was still hanging over the market as of January, 1951, a failure to consider this fact in appraising the value of a lease to run from May 1st to December 23, 1952, is indicative of a failure to apply the underlying principles of appraising such property.
 
 
 17
 So, too, with respect to the December 23, 1952, valuation of the fee. The Commissioners arrived at their valuation by capitalizing the anticipated income from the property. Of course, such valuations would vary directly according to the rental value assigned by the fact finders to the property. The Commissioners found an average valuation of all of the building space of 60 cents per square foot as contrasted with the average of a little over 20 cents per square foot at which it was offered in January, 1951. We do not understand that the Government here contends that this court should determine that the 20 plus cents average should be accepted as a matter of law and the award modified accordingly. We do not do so. We do hold, however, that the Commissioners erred in not considering as one of the most important elements of the value as of the date of December 23, 1952, the fact that a hypothetical purchaser and seller would arrive at a price which would be largely controlled by the fact that the purchaser's return on his investment would depend on his being able to rent it on a market which, less than two years previously, had been unable to absorb a large part of it at a rental of approximately 20 cents per square foot.
 
 
 18
 The extreme significance of the treatment given to this excess of factory space and excess of land in the two valuations as of May 1, 1951, and December 23, 1952 is fully recognized by the Commissioners. By their improper treatment of these facts, their findings and conclusions are necessarily distorted. This is indicated by the statement of the Commissioners in their findings:
 
 
 19
 "Whether or not this portion of the property was actually on the market significantly enough bears upon the opinions of the experts as to the supply of industrial property on the market and consequently would have a strong bearing on the reasonableness and validity of their estimates of value." (Emphasis added)
 
 
 20
 The Commissioners then pointed to the fact that no leases were permitted by the Dock Board after January 10, 1951, which action by the General Services Administration of the Government the Commission said, "turned out to be the means employed to prevent the Dock Board from making any further leases because [it] had a prospective tenant for the unleased portion of the property." Thereupon, the Commissioners found "the Dock Board thereupon considered that the property was off the market at that time;" and further, "under these circumstances, we can only conclude that the unoccupied portion of the property had been removed from the open market on January 10, 1951, and was not in fact available in the market from that date until the institution of these proceedings."
 
 
 21
 Thus, it is clear that in determining the value of the unleased portion on a rental basis from May 1, 1951 to December 23, 1952, the Commissioners treated the matter as if the 1,767,000 square feet of unrented space were not overhanging the market. This, as we have pointed out above, would not be the case if we were to assume the existence of a hypothetical purchaser and hypothetical seller on May 1, bargaining over the price to be paid for such a lease.
 
 
 22
 The Appellee Dock Board stresses strongly the testimony given by a number of its witnesses to the effect that the 20 plus cent rental rate for which the property was being offered up to January 10, 1951 was a "sub-standard", a "bargain", a "ridiculously low" rate for the space. It is argued that the Dock Board did not need to make the kind of profit on the property that a private investor would. This, of course, has no relevance at all in the argument here made, because, no matter how "ridiculously low" the price for the space was, it was not being rented by the public even at that low price. It makes no difference what it was that caused the Dock Board to price the property under the market, if, in fact, it did so and the property remained vacant. When it became apparent that such large quantities of the property would not move at that sub-standard price, then that price obviously was the most that could be obtained for it at the time.
 
 
 23
 It is inescapable from what we have said, touching on the treatment accorded by the Commissioners to the large area of unoccupied space that would have been available to a hypothetical purchaser on May 1, 1951, on a lease to December 21, 1952, and to a purchaser of the fee on December 23, 1952, that the findings and conclusions of the Commissioners as to the value of these two items cannot stand.
 
 
 24
 What we have said with respect to the building space applies with equal force to the vacant land. The Commissioners concluded that the fair market rental value of the unleased excess land was $407,546.00 per annum or approximately $575 per acre. This contrasted with rentals at which the land was offered by the Dock Board up through January 15, 1951, ranging from $200 to $300 per acre. We find no basis in the evidence to warrant the Commissioners disregarding the rental rates which had been widely offered and unaccepted by the public in computing the value a few months later of the land which was not improved by the buildings. In computing the value of the fee to the land on December 23, 1952, the Commissioners assigned an average of $8,391.00 per acre based upon a rate of $12,000 per acre for 243.85 acres of so-called waterfront land and $7,000 for the remainder. This produced a total valuation of $5,938,142 for the 707 acres of open land. We think it is clear that the Commissioners disregarded the fact that the hypothetical seller and purchaser as of December 23, 1952, would have to consider a price to be paid for the entire 1,000.22 acres improved as it was. It could not be viewed upon the assumption indulged by the Commissioners that the Michoud tract would be off the market in arriving at that valuation.
 
 
 25
 Moreover, we conclude that the Government properly challenges the valuation of this land as of December 23, 1952. No reasonable hypothesis is stated by any of the witnesses to support their opinions of an acreage value in excess of $8,000 per acre for the excess land other than comparisons with small tracts (from 1 acre to 15 acres) on the Harvey Canal.[2] In commenting on the bases of the opinions of the several experts who testified before the Dock Board as to the values of the land, the Commissioners characterized the testimony in the following manner:
 
 
 26
 (WAGUESPACK): "This valuation by the witness appears to be nothing more than his particular costs of reproduction method of appraisal of the buildings with his opinion and judgment of building costs and depreciation arrived at by his desire to be competitive if he were offering the property for sale on December 23, 1952. Added to this is his competitive valuation of the land, not a reproduced cost of land, to arrive at his idea of what a willing buyer would have paid a willing seller."
 
 
 27
 (LEMARIE): "Mr. Lemarie stated that the most comparable land to that of Michoud was the land along the intracoastal canal at Harvey, Louisiana and that sales at Harvey were very largely the reason for his opinion of the value of the property in question here."
 
 
 28
 (BLUM): "The valuations which Mr. Blum placed on the land as aforesaid were arrived at by consideration of what he referred to as comparable to Harvey, Louisiana. He described a sale of about 2¼ acres of land located on the intracoastal canal of Harvey, Louisiana in July, 1948 for $13,500 per acre and chose to predicate his Michoud land valuation principally on that sale."
 
 
 29
 (AS TO ALL THREE WITNESSES): "The Dock Board experts, holding that their opinions of value were based on their judgment, experience and knowledge as industrial realtors, did consider, as we have already pointed out, the cost of reproducing the Michoud land in arriving at their conclusions. For these purposes, they employed the original cost of the improvements made and the factor, 1.98, of increase in such costs. All, except Waguespack, also took into account the sales prices of the land at Harvey, Louisiana."
 
 
 30
 We have carefully read the findings of fact and conclusion of the Commissioners and we find that they adopted the witness Lemarie's opinion of value. On this subject the Commissioners stated:
 
 
 31
 "In reaching our conclusion of the fair market value of the excess land, we have adopted the per acre valuations placed thereon by Mr. Lemarie, because we believe the evidence fairly sustains those valuations, which are $12,000 per acre for 243.85 acres of the so-called waterfront land and $7,000 per acre of the remainder. But, because we are of the opinion that the value influence of the canals would be more reasonably reflected in the whole of the property, we have computed the weighted average value per acre, which we find to be $8,391 per acre. Applying such rate to the 707.68 acres of excess land, we have reached our aforesaid conclusion of the fair market value of that acreage."
 
 
 32
 There was no evidence anywhere in the record of any tract of land approximating that of 707 acres, considered separately from the improved part of the Michoud tract, or a total of 1,000 acres of land including the improvements, having sold for any sum approximating $8,391 per acre. We think it is apparent from the statement of the Commissioners that the only conceivable basis for their valuation was that propounded by the witness, Lemarie, who stated that he was basing it on comparisons with property sold on the Harvey Industrial Canal. While we have recognized the general proposition that this court would not substitute its judgment for that of the trial court in determining whether a particular sale was too remote in point of time or was not comparable in size, this principal related merely to the admissibility of the evidence to be considered by the trial court. See International Paper Co. v. United States, 5th Cir., 227 F.2d 201. It falls far short of constituting a rule that the appellate courts may not reverse a finding of value which it finds to have been based on a comparison of the condemned property with other tracts which neither by location nor quantity of land involved or other characteristics bear any resemblance to each other in the market. We, of course, do not attempt to ascertain the true value of the unused land as a part of the total tract to be valued. We do conclude, however, that the Dock Board did not carry its burden of establishing what the true value is. Again, it is necessary for us to reiterate that the Commissioners did not have before them the problem of valuing separately the 707 acres of land. They had the problem of valuing 1,000.22 acres with all of the improvements and subject to all of the limitations which characterized the Michoud Industrial Facilities. What the Commissioners did in this respect was to accept the valuation based on a witness' testimony that in his opinion 27 cents per foot for the waterfront property and 20 cents per foot for the remainder of the acreage was the fair market value. To the extent that he had any backing for this estimate at all it was that small tracts of land of two or three acres fronting the Harvey Canal, some fifteen miles distant, had sold at 30 cents per square foot. In this connection, when witnesses and Commissioners speak of valuing some 700 acres of land at so much per square foot, it must be borne in mind that they are dealing with approximately 30,000,000 square feet. No witness testified that it was customary or usual in the New Orleans market to buy or sell any substantial acreage on a square foot basis.
 
 
 33
 Obviously, since what we are dealing with here is not a lease of 1,767,000 square feet of floor space in the buildings alone or a lease of the unused acreage alone from May 1, 1951 to December 23, 1952, but is a lease of the entire tract of land, including the improvements thereon less the occupied portion for that period, it was improper for the Commissioners to appraise the rental value of the buildings, even if they had used the proper rental value for them, and then appraise the rental value of the land separately and add the two together in order to compute the value of the property on a rental basis for these periods of time. See United States v. Buhler, 5th Cir., 305 F.2d 319. What the Government took and what should be valued is the entire tract for a period of approximately 20 months. This, again, must be what hypothetical parties dealing at arms' length would agree on, viewing the land and buildings, with the disadvantages of much of the choice locations having already been leased to others. We find no evidence in the record directed towards an ascertainment of the worth of the land as improved in the hands of a willing purchaser acquiring it from a willing seller for such a leasehold interest.
 
 
 34
 Moreover, the method of appraising the value of the rental on the vacant land from May 1 to December 23 is clearly erroneous. The Commissioners accepted the testimony of one of the witnesses that the land would be worth an average of $8,391.00 an acre on December 23, 1952, and they then simply discounted this by 10 percent in order to compute its value as of May 1, 1951, and then assuming that an investment of this kind should yield a rental return of 8 percent to the owner they found that the annual rental value of this property was $407,546 per annum or $672,451 for the period. It is difficult to understand where the Commissioners found the authority for assuming a rental value of land based on their conception of what the land was worth. This is the reverse of the usual process of ascertaining the value of land by capitalizing its rental potential. We think it is plain that in the absence of any substantial evidence to the contrary it must be taken as we have indicated above that the rental rates for the land, which were in effect as of January 10, 1951 must be deemed to be the rents to be used for the valuing of the taking by the Government on May 1, 1951.
 
 
 35
 There is another source of gross over-valuation of the value of this leasehold resulting from the manner in which the Commissioners merely assumed that land having a value of so much per acre would yield rent of 8 percent of that amount to the owner. Such an assumption is based on the theory that the land would be fully utilized, in spite of the fact that between 85 and 90 percent of the open land here in issue had failed to attract tenants at the $200 to $350 offering rates. It would be a wild assumption, indeed, that would justify a finding that the Dock Board actually lost rental during the period from May 1, 1951 to December 23, 1952, equal to a stated rate of return on the value of the property. It would be equally improper for the Commissioners to arrive at a value under such circumstances by simply multiplying the correct rate per square foot for rent by the number of square feet available and then applying this for the entire 20 month period. It must be apparent to anyone considering the facts here that no matter how energetic the owner of this property might be in pushing leases at the 20 cent per square foot rent in the buildings or at the stated rent per acre of land for the vacant land, such owner could not be expected fully to utilize all of the vacant space for the entire period to December 23, 1952. Nor could it be assumed that a hypothetical tenant interested in this entire space would be likely to be found who happened to need exactly the amount of space, both in land and buildings here available, to warrant a finding that every acre of the land and every foot of the buildings would actually contribute its rental possibility to the income for this period.
 
 
 36
 To simplify the thought we have just expressed, we state that on the record before us any suggestion that if the Government had not condemned this property in the nature of a lease from May 1, 1951 to December 23, 1952, either the Michoud Industries or any other owner of the property would actually have enjoyed net rentals of $2,260,911 of which $672,451 was for land and the remainder for unleased portions of the buildings, would be simply fantastic. After all, what the Court is required to do is to determine the figure which would compensate Michoud Industries for the loss it suffered by being deprived of this property for this period of time. What the Commissioners have done is to assign a value for rental purposes of 54 cents per square foot for every square foot of space in the buildings although approximately 3 months earlier there were 1,767,000 feet of space available at 20 plus per square foot and to assign approximately $575 per acre rental value to the unoccupied land although at the same time previously there was over 700 acres of this land available for rent at $200 to $350 per acre. They then multiplied this figure by the total number of square feet and acres, respectively, and multiplied this result by 1.65 years. The Commissioners thus gave the Dock Board the sum of $2,260,911 as rental value for the premises.
 
 
 37
 It appears that for the reasons just cited, as well as because of the use by the Commissioners of the incorrect rental figure, previously discussed, the valuation of Dock Board's temporary interest must be set aside.
 
 
 38
 THE LESSEES' INTERESTS.
 
 
 39
 Turning now to the third taking, that is of the property owned by the lessees, which was taken by the Government on May 1, 1961, we find that the lessees have a much more appealing argument against the application of the principle which we have heretofore held controls the value of the interests of the Dock Board. This is because of the fact that when the tenants who were occupying space in the Michoud property were faced with the necessity of surrendering the property, they were required to find space on the market in the vicinity of the city of New Orleans as it then existed. At that time, as they point out, the Government had coincidentally condemned the 1,767,000 square feet of the Michoud manufacturing, office, and engineering buildings. The tenants, therefore, were faced with the prospect of going out of business or finding other space adequate to their needs. The proof offered by them was to the effect that such space was available only at rentals some three times as much as they had been paying under their lease agreement with the Dock Board. Under these circumstances, the lessees say, the fact that some of them had acquired their leases as late as January, 1951, and the fact that other space was available as recently as January at rentals of twenty plus cents per square foot should not enter into the picture at all.
 
 
 40
 Unfortunately for the lessees the courts seem to have dealt with this very situation where the person whose property is condemned by the Government has sought to obtain a valuation for the property taken based on the then market value, even though the market has risen by reason of the needs of the Government which brought about the original taking. We note particularly the Supreme Court decision in United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392. There the United States condemned a tug owned by Cors. It appears that at the time the tug was condemned the second World War had been in progress for sometime, and the Court of Claims found a "fair market value at the time of the taking was $15,500," but, as the Supreme Court said in its opinion:
 
 
 41
 "The Court of Claims found that at the time of the requisitioning there existed in and about the Port of New York `a rising market and a strong demand for tugs of all types' due in part at least to the government's requisitioning program. It found that the market value of the tug had been enhanced $5,000 by October 15, 1942, due (1) to the great increase in shipping in harbor traffic because of the war, and (2) to the government's need for vessels in the prosecution of the war."
 
 
 42
 In reversing the judgment for reconsideration by the Court of Claims, the Supreme Court said:
 
 
 43
 "In time of war or other national emergency the demand of the government for an article or commodity often causes the market to be an unfair indication of value. The special needs of the government create a demand that outruns the supply. The market, sensitive to the bullish pressure, responds with a spiralling of prices. The normal market price for the commodity becomes inflated. And so the market value of the commodity is enhanced by the special need which the government has for it.
 
 
 44
 "That seems to have been the situation in the present case. For, as we have seen, the Court of Claims found that at the time of the requisition there was `a rising market and a strong demand for tugs of all types' in and around the Port of New York, due in part at least to the shortage of tugs resulting from the government's requisitioning program.
 
 
 45
 "It is not fair that the government be required to pay the enhanced price which its demand alone has created. That enhancement reflects elements of value that was created by the urgency of its need for the article. It does not reflect what `a willing buyer would pay in cash to a willing seller,' United States v. Miller, supra [317 U.S. 369], 374 [63 S.Ct. 276, 280, 87 L. Ed. 336], in a fair market. * * That is a value which the government itself created and hence in fairness should not be required to pay." Page 333 of 337 U.S., page 1091 of 69 S.Ct., 93 L.Ed. 1392.
 
 
 46
 While this rule may well work a hardship to a tenant who must relocate at a time when the Government has taken space occupied by him, and who must unquestionably pay for the space later rented by him at the going rate, even though that rate be an inflated one, it seems clear that the Supreme Court has settled this issue in such manner as to be binding on this Court. We are forced to conclude, therefore, that it was error for the Commissioners to disregard the rental rates paid by the tenants insofar as it was similar to the large amount of space still unoccupied in the buildings. It is true, as contended by some of the appellees, that some of them had acquired particularized space with peculiar and especially valuable characteristics that could not be duplicated in any of the remaining vacant space in the buildings. To the extent that the lessees have proved the existence of such facts and to the extent that they have proved that they had something of a bargain in making their own leases that kept their leases from representing the fair market value of the space at the time the leases were entered into, they are entitled to the benefits of their bargain. As to all other tenants, and as to all space which was susceptible of being duplicated in unleased space in the buildings, we conclude that the Commissioners and the trial court erred in not accepting the terms of the particular leases or the going rate as of January, 1951, whichever is higher, as the fair market value of the space as of May 1st of that year. In order, therefore, that these principles may be given effect in arriving at the proper valuation of the leasehold interests, the awards to the tenants must be set aside.
 
 
 47
 CROSS APPEALS.
 
 
 48
 We have considered the cross appeals by the Dock Board and by the Laclede Steel Company touching on the dates from, and the amounts on, which interest should run against the Government. The Dock Board contends that interest should run on the entire amount of the value ultimately found to be due for the taking of the fee interest owned by it without a prior deduction of the balance of some $9,000,000 which it owes the Government for the original purchase price of the property. We think it is immaterial what the title held by the Dock Board may be called or known under the Louisiana Jurisprudence. It is clear that the trial court had the authority to distribute the award to the parties who had an interest in the property. The Government had such an interest by virtue of its contract of sale to the Dock Board. The court thus had the authority and duty to award to the Government the amount still owed to it by the Dock Board and then to provide that interest should be paid to the Dock Board only on the balance, if any, of the total valuation.
 
 
 49
 Laclede complains that although it was not actually required to surrender the premises occupied by it until November 1, 1951, it was entitled to interest from May 1, 1951, because such was the date at which the United States originally sought temporary use and occupancy in its petition of condemnation. However, the court's original order granted the United States the right of possession to the leased premises as of May 1, 1951 to other tenants, but not as to Laclede. By an order entered on the motion of Laclede it was permitted to remain in possession until November 1, 1951. It contended that it was merely a tenant of the Government between May 1 and November 1 and it was actually out of possession as of the earlier date. We conclude that this argument has no merit. See United States v. Mahowald, 8th Cir., 209 F.2d 751.
 
 
 50
 On the cross appeal of Laclede Steel Company the judgment as to the date of the running of interest is affirmed. The cross appeal of the Dock Board is without merit and it is held that upon the final award being arrived at in favor of the Dock Board, it will be proper for the trial court to deduct the amount then due to the United States under the original contract of sale before permitting interest to run against the United States.
 
 
 51
 DISPOSITION ON REMAND.
 
 
 52
 The rulings we have made as to the measure of market value at the time of the several takings, simplifies somewhat the remaining issues to be disposed of by the trial court. These issues are: What was the fair market value of the right to possession of the property from May 1, 1951, to December 23, 1952?; what was the fair market value of the property on December 23, 1952?; what was the fair market value of the several leases in light of the standard heretofore set?
 
 
 53
 This case has been pending for a long time, the original complaint having been filed in April, 1951. This court has previously dealt with the problem arising when it has become necessary for us to reverse a District Court judgment based upon findings of Commissioners, which we have found to be erroneous. In United States v. Leavell & Ponder, Inc., 5 Cir., 286 F.2d 398, we found it necessary to reverse the judgment of the District Court, which adopted in full the findings and conclusions of Commissioners. We said on page 409 of 286 F.2d:
 
 
 54
 "The failure of the commissioners here to comprehend the true nature of their duties, as evidenced by their departure from known and accepted standards of valuation and their complete failure to recognize and apply rules of evidence during the hearing, make it impossible for the trial court or this Court to determine whether its findings were based on legally admissible evidence, and its failure to make adequate subsidiary findings of fact emphasize the reason for the rule that reference to a commission is the exception and not the rule."
 
 We then said:
 
 55
 "A jury trial at which the trial judge promptly rules on the admissibility of proper testimony and then narrows the issue by appropriate charge to the jury may, indeed, frequently simplify even what appears to be a complex valuation of property."
 
 
 56
 In that case we sent the case back for trial by a jury.
 
 
 57
 More recently, in United States v. Buhler, 5 Cir., 305 F.2d 319, having determined that the Commissioners in that case also failed to apply recognized valuation standards, we said:
 
 
 58
 "As pointed out in the opinion of this Court when the case was here last, we were then, as we are now, loathe to cause a further delay in the final disposition in this matter by taking such action as requires a full, new hearing before the commissioners or on a remand now requiring that the matter be submitted to a jury. Having pointed out certain areas in which we feel that the decision of the trial court must be reversed as being clearly erroneous, we think the matter now stands in such a posture as will permit the trial court to reconsider its findings based on the commission's report and give effect to our rulings announced in this opinion. As this Court decided in United States v. Twin City Power Co. of Georgia, [5 Cir.] 253 F.2d 197, 204: `It would be futile for the court simply to direct the commission to reconsider its findings.'"
 
 
 59
 Nevertheless, we do not conclude that the case should not be referred once again to the Commissioners. We do not wish to circumscribe the trial court in its determination whether the valuation questions remaining should be passed on by a further reference or by a jury, or whether the trial court considers that sufficient evidence is available and sufficient findings as to basic facts are present in the original record to permit it to reconsider its own order approving the Commissioner's report and permit it to give effect to the rulings herein announced without a further submission to a jury.
 
 
 60
 The findings of value by the trial court in favor of the Dock Board and of the lessees are, for the reasons heretofore stated clearly erroneous. They are reversed and the case remanded to the trial court for further proceedings not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 By using the term "fee" we do not use it in a technical sense, but we use it as that interest owned by the Dock Board separate from the interest of the lessees, and separate from the interest of the United States Government, which held a vendor's lien on the entire property arising from its previous sale to the Dock Board
 
 
 [2]
 This canal is the westward extension of the intra-coastal canal and extends from the Mississippi River westward from a point some three miles upstream from Canal Street in downtown New Orleans. The industrial sites on the Harvey Canal were heavily built-up at this time, largely by petroleum and related industries
 
 
 
 61
 JOHN R. BROWN, Circuit Judge (dissenting).
 
 
 62
 Amplifying the strictures voiced in United States v. Leavell & Ponder, Inc., 5 Cir., 1961, 286 F.2d 398, 409 and echoed more recently in the second appeal in United States v. Buhler, 5 Cir., 1962, 305 F.2d 319, 331, against the use of Commissioners or, for that matter, anything but a jury trial in condemnation cases no matter how complex, the Court's opinion gives the impression of a runaway Commission indifferent to its duties, oblivious to the law and interested only in granting an award reflecting the exaggerations of self-interested persons posing as experts. Ending as it does with words bearing overtones that "it would be futile for the court simply to direct the commission to reconsider its findings," added meaning is read into the broadside from Leavell & Ponder which charges the Commissioners with a "failure * * * to comprehend the true nature of their duties, as evidenced by their departure from known and accepted standards of valuation and their complete failure to recognize and apply rules of evidence[1] during the hearing * * *," 286 F.2d 398, 409.
 
 
 63
 As unrewarding either to the dissenting Judge, the jurisprudence, or to the losing party as is a dissent in a case of this kind, I feel compelled to register my reasons for my difference with the Court. The record, when properly analyzed will, in my judgment, reveal that this was a proper case for the use of a Commission. The Commission was composed of conscientious citizens, one of whom was a well regarded and competent lawyer of New Orleans. And if — as the Court holds — there were errors, they were errors of the distinguished trial Judge, long experienced in this field.
 
 
 64
 This is important, not as a defense of the integrity of the persons comprising the Commission, but as a strong indication to me that what the Court is doing is retrying a condemnation case. So long as F.R.Civ.P. 52(a) and 53 stand, that is not our function.
 
 
 65
 THE NEED FOR A COMMISSION.
 
 
 66
 Within a short time of the filing of the Government's complaints, 37 lessees had become parties in addition to the Dock Board. On the principles enunciated in the trial Court's written charge, the Commission's Report and now in this Court's opinion, these were in effect 38 separate suits. True, there were some common questions, both of law and fact, but in the final analysis each tenant's claim stood on its own. And as to the Dock Board each of the 37 leases (plus others) presented facts or circumstances having some bearing on its three claims of (1) reserved rent, (2) value of the occupancy of the unleased portions of the premises and (3) the value of the fee as of December 23, 1952. In addition there was the fourth main claim on behalf of the tenants as to the value of the unexpired leaseholds. That also bore further on the Dock Board's fee claim since under supplemental instructions, the Commissioners were required to ascertain the adverse effect of outstanding leases as of the date of taking of the fee. Thus by simple arithmetic the tenants' claims alone presented in excess of one hundred issues.
 
 
 67
 More important than mere statistics was the subject matter which the Commission necessarily had to deal with as the witnesses undertook to reconstruct a value to supply the fictional test of the willing seller and willing buyer concerning a property which no one would sell and no one would buy. Besides the physical characteristics of the property which in the index to the Report ran the gamut of a description of each of the main buildings, the facilities, the electrical, water, sewerage, railroad system, flying field, parking lots, fuel tanks, wharves, fences, and gates, the condition of the property, the needs for rehabilitation, the Commission had to deal with what it described as the "economic factors and conditions" bearing upon the supply and demand for property of this kind in the New Orleans area. These factors, the Report stated, would "include location of the property, access to transportation facilities, utilities, labor supply, police and fire protection, insurability, availability of comparable property, protection from flood and demand for the industrial property in the New Orleans area." This went off into interesting, but essential, forays into such things as the intricacies of railroad tariff rates, switching limits, and an involved inquiry into availability and cost of insurance, and the like. The summaries of these factors (other than availability of industrial property) alone takes 20 printed pages in the Commission's Report. And, of course, all of these were merely subordinate to the principal question of market values.
 
 
 68
 This multi-party, multi-issue case, which Government counsel estimated would take 6 to 8 months to try, was not one suited for a jury trial. Under F.R. Civ.P. 71A, the Court was authorized to appoint a Commission. We ought not in this way retroactively criticize the Judge for this sensible action.
 
 
 69
 PROCEEDINGS OF THE COURT AND COMMISSION.
 
 
 70
 The Court appointed a Commission with a New Orleans attorney as its chairman. Numerous pretrial hearings were held. The Court invited suggested charges to be given by the Court to the Commission. These were the subject of extensive comment, criticism, objection and hearing. As its alpha and omega, as its scriptural guide, these are reprinted in the opening pages of the Commission's Report. The trial Judge's order confirming the Report states expressly that "no exceptions were taken to the charges as finally given by the Court."[2] The Commission held hearings and took evidence on 70 days. As the Report states, the "record in this matter consists of 7,262 pages of testimony of fifty-one witnesses, some of whom were examined and cross examined for one to fifteen days, consecutively. * * *." In addition 367 exhibits were received. Testimony of the principal experts for the claimants (Lemarie, Waguespack, Blum, and Carrere) ran in the neighborhood of 700 pages each. That of the Government experts (Aschaffenburg and Johnson) was even longer. Full briefs were filed and extended arguments were heard by the Commission.
 
 
 71
 The Report of the Commission, prepared without haste, reflected the authorship of its attorney-chairman by a style that would do credit to any lawyer, or for that matter any judge. It covers 250 pages of the printed record. It is a model of detailed, nonargumentative and objectively presented discussion of the evidence pro and con, witness by witness, issue by issue. After giving the parties the better part of a year in which thoroughly to brief the matter, Judge Christenberry heard arguments over several days. He overruled the objections of the Government, sustained the Report of the Commission, and entered a final judgment based thereon. Judge Christenberry's order expressly made "the report of the commission * * * the findings of fact and conclusions of law of this case."
 
 
 72
 Of course a record of that length inquiring into the multiple issues of this involved case had much conflict in it. The case ended as it began with the parties in dispute as to the principal question of valuation of the several interests appropriated. This Court's opinion recognizes as the first element that "(1) * * * the 1,000.22-acre tract with such a tremendous complex including buildings of truly gargantuan size, which must be valued as a whole by determining its fair market value, does not really have any comparables in the market on which expert opinions of valuations can be based." This is a recognition that if the Fifth Amendment is to have the vitality which courts read into it, the determination of market value inescapably rests upon the expert judgments and opinions of those skilled in the field after the trier of fact makes such modification and adaptation of them as the total record reasonably required.[3]
 
 
 73
 A brief consideration of the Report and the record demonstrates, in my opinion, that while the Commission did not accept the contentions of the Government, it did not, as the Court's opinion charges, ignore these factors as irrelevant, nor was the Commission's action a departure from accepted principles.
 
 TREATMENT OF UNLEASED SPACE AND VACANT LAND.
 
 74
 The Court's opinion would lead one to think that the experts for the Dock Board and tenants, as well as the Commission, looked on the case as though the 1,767,000 square feet of unrented space, as well as the 700 acres of vacant land, was actually under lease.[4] It also implies that in giving their several opinions, the experts were unaware that despite active solicitation of tenants at the uniform 20 cent rate, substantial areas remained unoccupied. This leads the Court to state that "[w]e think it is equally plain * * * the Commissioners * * * disregarded these same facts and they based their findings of values on hypotheses used by the various appraisal experts which excluded any assumption as to the existence of the [million] square feet of vacant space." As to the two takings by the Dock Board, the Court then holds that "it was clearly erroneous for the expert witnesses upon whose testimony the Commissioners relied[5] * * * and for the commissioners themselves to disregard the undoubted fact that a hypothetical purchaser * * *" would make his offer in the light of unoccupied areas of land and buildings.
 
 
 75
 The whole implication of the Court's opinion is that both the witnesses and the Commission were indifferent and completely oblivious to the admitted fact of (a) the 20 cent uniform rate, and (b) the existence of a large amount of unleased property. But the Commission's Report does not bear out this charge. The Report reflects the Commission's awareness of the problem. It stated: "The Government has contended that because substantial areas, land and buildings, were unrented to January 1959, a lack of demand was thereby indicated and, therefore, at May 1, 1951, the Michoud rentals, conclusively established the fair market rental values at that date. We do not believe this contention tenable in the light of all of the evidence." The Commission then referred to the uncontradicted testimony that the property actually had been taken off as early as January 1951. But, presumably anticipating the very argument advanced by this Court that the theoretical willing purchaser-seller must look at the property as they found it on May 1, the Commission continued further. Even, "if it had been on the market, we don't understand that, because it may not have been all or substantially all rented, it would necessarily follow that the existing rentals would be absolutely controlling, in the determination of fair market rent, any more than had it been fully rented or fully unrented. If no portions were rented, we don't believe that such would render its fair market value nil. The owner, we understand, is entitled to have his property not only considered in the light of its highest and most profitable use, but in the light of all conditions, not alone one, that make the market which determines the value of his property."
 
 
 76
 In many other places and ways, the Commission also revealed that its decision was an articulate judgment formed as a result of the study of this whole vast record including the Government's contention on standard rentals and vacant space. Thus, as to the Dock Board uniform rental contracts, the Commission stated "there is no question that the rents were not arrived at with reference to, nor were they intended to coincide with, fair market rental value when established or in the future during the effectiveness of the schedule." The Dock Board was not in the business of making money out of property rentals. As a public agency it was interested in expanding the economy of the city and port. The payment of rent was secondary. The objective was to attract and hold new and growing industries. "The Michoud rentals," stated the Commission, "were labeled pioneer, substandard and unrealistic rents by the appraisal witnesses for the Dock Board * * *. And we believe the record herein supports their opinions that these rentals are not indicative of and do not represent the fair market rental value of the property at the critical dates involved here."
 
 
 77
 Nor by any stretch of the imagination were the Commissioners freelancing on their own. Judge Christenberry had given precise written instructions with a clarity that could not have been improved on in an oral charge to a weary jury at the end of a 6-months trial. At the Government's request, he first charged, consistent with its theory then asserted, that the Commission could consider the 1947 price of $9,500,000 on the sale by the Government to the Dock Board. On the other hand, the Court instructed that value was not dependent upon the use to which the property has been devoted but should be "ascertained and fixed on just consideration of all the uses for which the property is suitable * * *" as to which "evidence as to all such uses may be offered by either side."[6] But the Judge was even more direct. The Court charged that the experts in reaching opinions and the Commission in determining just compensation "are entitled to consider many factors including, but not necessarily limited to, * * * (a) rentals for comparable property in the New Orleans area." That instruction went on to make the matter specific. "In considering rentals obtained by the Dock Board for property leased at Michoud facilities, you are also entitled to give consideration to the [a] special circumstances affecting this property, such as the [b] availability of comparable space as of the date of the taking, [c] factors which might have influenced the Dock Board in making these leases, [d] which would not be present in the case of other landlords on the open market, and [e] other special circumstances which might pertain."[7]
 
 
 78
 It bears repeating that the Government acquiesced in this charge. The record shows no objection to it in the trial Court, and the specifications of error here do not attack it.
 
 
 79
 If this instruction was erroneous, then we ought not to criticize the Commissioners for a breach of their duty. And before Judge Christenberry can be put in error, there must be some objection properly made prior to the commencement of a long and involved and expensive hearing.[8]
 
 
 80
 The rules are changed after the game is over. Instead of Judge Christenberry's declaration that the Commission was "entitled to give consideration to the special circumstances affecting this property, such as the availability of comparable space * * *" etc., this Court now holds that as to the Dock Board takings "it was clearly erroneous * * * for the commissioners themselves to disregard the undoubted fact that a hypothetical purchaser * * * would have made his offer for the property in light of the fact that he would be buying 1,000.22 acres of land and buildings having 1,767,000 square feet of rentable property, which up until 3 months previously had not appealed to the prospective users of such space at a rate of a little more than 20 cents a square foot." Likewise, instead of declaring that the trier of fact should give some consideration to this, the Court goes on as a mandate to hold that "[s]uch rental price would therefore be the best proof of the going market value as of the time the last leases were made in January."[9]
 
 
 81
 Of course the difficulty in working with the Court's opinion is that it is difficult to ascertain when we are declaring law and when we have taken on the role of persons skilled in the sale, lease, rental, disposition and management of large industrial properties in a major port. Thus, to the argument that the "* * * Dock Board stresses strongly the testimony * * * that the 20+ cent rental rate * * * was a `sub-standard,' a `bargain', a `ridiculously low' rate for the space" since "* * the Dock Board did not need to make the kind of profit * * * that a private investor would," the Court responds with this absolute. "This, of course, has no relevance * * * because, no matter how `ridiculously low' the price for the space was, it was not being rented by the public even at that low price. It makes no difference what it was that caused the Dock Board to price the property under the market if, in fact, it did so and the property remained vacant. When it became apparent that such large quantities of the property would not move at that sub-standard price, then that price obviously was the most that could be obtained for it at the time."
 
 
 82
 There are only two things wrong with that statement. First, as I read the cases, it is not correct as a matter of law. Second, it is hardly true as a matter of economics.
 
 
 83
 As to the economics, it asserts that unless a major piece of property forming an industrial or business complex is fully rented at the rate being offered, it proves that the market demand is less than the rate being offered. If that were so, a major modern office building, if condemned shortly after completion, would have no value on capitalized rents. Nor would a major shopping center which takes time to fully lease. In this respect, there is, of course, a significant difference between the Dock Board's claim for (a) the value of occupancy from May 1, 1951 to December 23, 1952, and (b) the value of the fee on December 23, 1952. The former is essentially a problem of making good to the property owner the income which he would have earned during that brief period of occupancy. Unless in reasonable likelihood all of it would have been leased for the indicated rental value, the Court, on familiar principles of damages, could not make an award for 100% occupancy.[10] The fee claim, however, does not rest upon the immediate earnings of the property as of the date of taking. The property owner is being permanently deprived of his ownership. He is being deprived of the opportunity to receive income in the future. That future is here not less than the agreed expectancy of 33 years for the useful life of the buildings. True, the future must be a foreseeable one. But for properties of such vast proportions as this Michoud facility, its rental capability in an area and era of increasing property values and business expansion can hardly be fixed by ordaining as a matter of law that rental rates offered nearly two years before (January 10, 1951 versus December 23, 1952) are of dominant, controlling significance.
 
 
 84
 The Court's approach is, to me, also faulty on the law. For under the law value on a capitalization formula is not determined by improvident or unusual leases which, in the credited judgment of qualified competent experts, do not actually reflect going market conditions. "Where property in condemnation has been leased for a particular use, evidence of what the owner can fairly and reasonably receive as rental return for such use, even though this amount differs from the rental fixed in the existing lease, is proper as a possible capitalization factor to assist in the determination of actual market value. For capitalization purposes, neither the condemnee nor the condemnor should be bound by the rental of an unreasonable or improvident lease." Chicago, B & Q R.R. v. North Kansas City Development Co., 8 Cir., 1943, 134 F.2d 142, 152. See also Westchester County Park Commission v. United States, 2 Cir., 1944, 143 F.2d 688, 693; Sifuentes v. United States, 1 Cir., 1948, 168 F.2d 264, 266; 1 Orgel, Valuation Under Eminent Domain § 179, p. 704, § 182, p. 708; 5 Nichols, Eminent Domain, § 19.2, p. 215.
 
 
 85
 The Commission, from the running, ceaseless advocacy of the parties, the examination, re-examination, cross examination, recross examination and swabbing of all of the witnesses through hours and days of endless testimony, was thoroughly familiar with the Government's main theme. The Commission did not "ignore" it. It was weighed and found wanting.
 
 
 86
 I for one do not claim to know enough about New Orleans industrial property to declare, with the full weight of law behind it, that no reasonable person could have so concluded.
 
 
 87
 GOVERNMENT'S EXPERTS ASCRIBE RENTAL VALUE IN EXCESS OF DOCK BOARD UNIFORM RATES.
 
 
 88
 Experts proffered by the condemnees were not the sole source of facts showing a value in excess of Dock Board rates. The Government expert Aschaffenburg repeatedly asserted that between the period May 1, 1951-December 23, 1952, there had been an increase of approximately 12 to 15 percent in the level of industrial rents. Likewise the Government expert Johnson asserted that there had been an increase in excess of 50 percent over the Dock Board contract rates in the same period of time.[11] Since the Court holds that the Dock Board contract rates were theoretically available on May 1, it is evident that there must be a comparable increase if they are to be used in capitalizing value as of December 1952. Yet Government counsel are indifferent to that here.
 
 
 89
 Moreover, as to individual leaseholds the Government experts gave sworn opinions substantially in excess of the contract rate. For example as to the Laclede lease in the Hammer Building where Lemarie stated a rental value of 75 cents per square foot (which was accepted by the Commissioners), Government expert Nichols gave it a value of 40 cents and Johnson 30 cents per square foot. Similarly, Johnson asserting that a substitute property on Gentilly Road was comparable to that formerly occupied by Cloar Glass Company, Inc., in effect placed a 49.8 cent value on Cloar's lease. For other leases, Aschaffenburg fixed the value of 40 cents per square foot for floor space in the main manufacturing building and 50 cents per square foot in the Dry Kiln Building.
 
 
 90
 The Government offered each of these two witnesses. Despite this and now, without objection to the charge given to the Commission, it now feels free to assert, as it does, that the value of this leasehold could not exceed the 20 cent published rate.
 
 
 91
 The fact that some of these figures were testified to in connection with the claims of the tenants for the value of the unexpired leaseholds is of no significance. If the leaseholds on the critical date had that value to the lessee, it is because the leases had a free market value in that amount. To determine the value of the fee on that same date through the capitalization process, the same market value would have to be applied.
 
 
 92
 These few instances picked at random out of this vast record illustrate why in this hypothetical process of treating with a buyer and seller who never in fact existed, it is the informed judgment of those having extensive practical dealings with properties of this kind which finally prevails. Where such witnesses for both sides advance, as they did here, substantial and detailed reasons why the Dock Board published rates were not indicative, it was permissible for the Commission to credit these explanations and determine that the published rate was not a reliable guide of real worth.
 
 
 93
 VALUATION OF THE VACANT LAND.
 
 
 94
 As to the valuation of the vacant land areas, the decree of Judge Christenberry expressly adopting the findings of the Commission is swept aside with the pronouncement that "we * * * conclude * * * that the Dock Board did not carry its burden of establishing what the true value is." In reaching this conclusion several errors are specified. The first, as in the case of unleased portions of the buildings, was the lack of any "basis in the evidence to warrant the Commissioners disregarding the rental rates which had been widely offered * * *" for the unimproved land. Second, sales of property on the Harvey Canal are the sole basis for acreage values in the neighborhood of $8,000 and as a matter of law this is not a comparable. Third, values of buildings and values of vacant land ought not to have been separately ascertained and then aggregated. And related to this, there is no evidence on the aggregate value of the entire properties to a willing, single purchaser.
 
 
 95
 We deal first with the Harvey Canal matter. The Court first states there is "[n]o reasonable hypothesis * * * stated by any of the witnesses to support their opinions of an acreage value in excess of $8,000 per acre * * * other than comparisons with small tracts * * * on the Harvey Canal." Later on, after pointing out what no one can deny that there was simply no instance of the sale of land approximating 707 acres, whether considered separately or as a part of an improved tract of 1,000 acres, the Court reached this conclusion. "We think it is apparent from the statement of the Commissioners that the only conceivable basis for their valuation was that propounded by the witness, Lemarie, who stated that he was basing it on comparisons with property sold on the Harvey Industrial Canal." This leads the Court to declare the rule, recast by me in affirmative terms, that an appellate court "may * * * reverse a finding of value which it finds to have been based on a comparison of the condemned property with other tracts which neither by location nor quantity of land involved or other characteristics bear any resemblance to each other in the market."
 
 
 96
 With all deference, these conclusions are not supported by the record, and the legal declaration is in error. In condemnation cases evidence of sales of other properties is admissible for either one or both of two purposes: (1) to establish an actual going market for sales of like property which then becomes the best (if not the only) measure of just compensation; (2) as tangible evidence of one of the many factors leading a skilled expert to reach a conclusion on value where there is no going market. The distinction is vital as this Court has pointed out. "When the effort is not to show the sale of other property * * * as a standard of value, but these are referred to by a witness experienced in dealing with such properties in the neighborhood and qualified to have an opinion on values, merely as things in his knowledge which contributed to the opinion which as an experienced man he holds, his opinion ought not to be rejected from evidence, but ought to go to the jury for their consideration of its reliability * * *," Atlantic Coast Line R.R. Co. v. United States, 5 Cir., 1943, 132 F.2d 959, 963. As we more recently stated in approving this case, the "experts must base their opinions on such information in the art that accounts for their becoming experts." And, not surprisingly, that means that even "a certain amount of hearsay is a necessary ingredient of the opinion * * *." International Paper Co. v. United States, 5 Cir., 1955, 227 F.2d 201, 208. What was said by the Ninth Circuit in United States v. Johnson, 9 Cir., 1960, 285 F.2d 35, 39, n. 2, properly characterizes the evidence in this record as to Harvey Canal sales. "Furthermore, such evidence was not offered or received as the measure of value of the property on the date of taking but was merely one approach used by all the experts, including the one who testified for the government, in arriving at their opinions as to the value of the property and as a check on such opinions." That Court then proceeds to maintain the distinction as to the legal admissibility and treatment such evidence is to receive. "Quite obviously when evidence of the price for which similar property has been sold is offered as substantive proof of the value of the property under consideration, a foundation should be laid showing that the other property was sufficiently near that in question, and that it was sufficiently like the property in question as to character, situation, usability and improvements to make it clear that the two tracts were comparable in value. However, where evidence of sales of similar property is offered not as substantive proof of value, but merely in support of, and as background for, the opinion of an expert as to the value of the land in question, the requirement of such foundation is not so strict." 285 F.2d 35, 41. Continuing on and quoting from Chief Judge Parker, the Court then points out that the expert's opinion is to be tested through cross examination which was, of course, done at great lengths here.
 
 
 97
 As we pointed out in Atlantic Coast Line R.R. Co. v. United States, supra, any other rule would effectually deny Fifth Amendment protection to large or unusual properties especially in an era and area of an expanding economy in which no comparable sales could be cited or pointed out. It is uncontradicted, as the Commission's Report found, that "all experts agreed that there were no tracts of industrial properties available which were situated on a tidewater channel in or around New Orleans * * * which was similar in size, character and condition as the Michoud land." The Commission was not, as this Court's opinion implies, misled into believing that Harvey and Michoud were comparable.[12] The Commission under the heading of "Comparable Sales" extensively analyzed the testimony of the competing experts. It pointed out that the Dock Board's appraisal witnesses "in reaching their conclusions of value" either "relied on or attached considerable weight" to sales at Harvey as all thought it "was the most comparable * * * because it was located on the same tidewater canal." In the same discussion the Report pointed out that the "Government appraisers cited none of the sales at Harvey, assigning generally as the reason the fact that they considered the property at Harvey not comparable to the Michoud land because of the smaller size of the former * * *." Following this the Commission then discussed at greater length the sale of the 140 acres of raw land adjoining Michoud purchased by the New Orleans Public Service in August 1952.[13] In using this as a basis for value both sets of experts had to make numerous adjustments because of the difference in elevation, the expenses to raise that land to the elevation of the improved Michoud land, etc. But this was not all. The Commission followed this by an even more extended discussion of the value of various leases cited as comparables. After all of this information — Harvey Canal, Public Service, leases, etc. — had been weighed and analyzed, the Commission recorded its conclusions. In so doing the Commission expressly disclosed that its valuations were not the product of any erroneous use of asserted comparables.[14]
 
 
 98
 Though this fact is not mentioned in the Court's opinion, this Court was the target of petty garbling which, even within the limits of strong advocacy, hardly does credit to the sovereign. The impression which the Government sought to create is that these opinions of Mr. Lemarie, seriously considered by the Commission, were mere exaggerations in behalf of interests served by him for a fee. Thus the Government urged the Court to reject, as it does, Mr. Lemarie's valuation of $12,000 per acre for waterfront property at Michoud because he got the figure "out of my head."
 
 
 99
 I resist the temptation to embellish it, for the record, as it continues is more than sufficient refutation:
 
 
 100
 "A. Out of my head.
 
 
 101
 "Q. In other words, you had nothing to rely on as a comparable to give you a figure of 30 cents per square foot?
 
 
 102
 "A. Mr. Wisdom [Government counsel], I think the formulas that I used are means of checking. But I think that reasonable judgment is expected of me as a witness that has been in the business for as many years as I have been to apply that reasonable judgment to the figure that I have compiled. I have compiled a lot of figures here, but when I get right down to it, I use what I consider is reasonable judgment to determine the value of the property.
 
 
 103
 "Q. I can understand, Mr. Lemarie, your stating that 30 cents was the figure per square foot that you assigned as the value of the property at Michoud, and that if you say so, that that was a matter of judgment, but what I want to make certain is that there were no comparable properties that you examined that led you to that conclusion?
 
 
 104
 "A. I didn't take any particular property into consideration. I know that property in the heart of the city sells for $1.50 to $2.00 a square foot. I know that property sells in other areas for 50 cents a square foot. I know that property has sold on the Harvey Canal for 40, 50 and 60 cents a square foot. I know that property down in the downtown area here along the river front has sold for $1.00 and $1.25 a square foot. I put all of that together and I used my experience that I have had, and reasonable judgment in determining `If I know all of this, what is this worth' and I say it is worth 27 to 30 cents a square foot."
 
 
 105
 That Lemarie and the Commission were on sound ground, the Government expert, Johnson, makes clear. After first testifying that he investigated sales of other properties which he thought to be as comparable as possible, Johnson in response to this question: "What did you do in order to help you reach your conclusions as to the values you placed on the open land * * *," gave this answer:
 
 
 106
 "A. * * * But in the final analysis I used my judgment based on my years of experience and knowledge of industrial property in this vicinity."
 
 
 107
 And then, breathing life into recognized works on real estate appraisal,[15] Mr. Johnson stated that "I thoroughly subscribe" to Hart's text that "after the appraiser has applied all the theory and has analyzed all of the data, and has come up with his conclusions, he should walk him across the street and put it on the curbstone and say to himself, `Now, what can I peddle it for?' And if the answer doesn't coincide with the answer determined by the study of all of the data, then they ought to go out the window and the common sense figure should be the conclusion." Elaborating on this he concluded:
 
 
 108
 "A. I thoroughly subscribe to it. I think about 25 percent of the appraisal business is experience and 25 percent theory and 50 percent of it common sense, maybe 51 percent of it common sense."
 
 
 109
 Perhaps stated in more traditional language that is precisely what the Sixth Circuit is saying in Knollman v. United States, 6 Cir., 1954, 214 F.2d 106, 108-109.
 
 
 110
 I have dwelt on this at length because to me it demonstrates that no matter how much we sugarcoat it, in this reversal this Court is engaging in the process of fact finding. In our remote positions whether in the Courthouse at New Orleans or from our various home environs, we are undertaking to declare as a matter of law that in these opinions these working New Orleans real estate experts[16] simply do not know what they are talking about. To reverse the judgment, we are saying as Judges that no reasonable man could find that waterfront property of the kind available at Michoud does not have the value placed on it by Lemarie or the others.[17] When Courts make such statements, it inevitably means that Judges are here testifying from their own or collective experience. In order for us to say that no reasonable man could hold, we must first know the facts. If that is so, then I am unaware of the moment it came to me that waterfront properties do not reflect their extraordinary value as deep as 1,000 feet. If in that process my own experience counts for anything, I have difficulty in excluding rather intimate knowledge gained by going into, around and through numerous docks, terminals, shipyards, and the like throughout ports in the Gulf Coast.
 
 
 111
 The next error specified is that the Commission valued the vacant land and the building areas (leased and unleased) separately and added the two together. This is another instance of the Court's preoccupation with the hypothetical willing seller-purchaser of the entire property as a whole. Granted that this is the ultimate aim in the evaluation process, there is nothing in the law, and certainly nothing in the experience of businessmen and economics, which would commit either the Commission or the experts to the artificial process of giving one single value one time and without any elaboration as a breakdown.
 
 
 112
 In evaluating an office building in a modern city, for example, any real estate man in his right mind would certainly differentiate between the rents obtainable for ground floor space, that in subbasements, that in exterior office space and that for interior spaces near corridors, elevators, service areas and the like. Likewise, the so-called theoretical investor about ready to purchase properties as complex as Michoud would necessarily arm himself with a staff of inspectors, surveyors and appraisers by which to determine the reasonable value of the identifiable component parts of the complex. True, in that process one cannot add 2 and 2 and get more than 4. But unless 2 and 2 are first identified and then added, the so-called expert would indeed lay himself open to the charge urged by the Government against Lemarie that his opinion would be "out of my head" and nothing more.
 
 
 113
 Certainly nothing in United States v. Buhler, 5 Cir., 1962, 305 F.2d 319, 325, or the earlier case so often miscited by the Government in these appeals, United States v. Certain Parcels of Land in Rapides Parish, 5 Cir., 1945, 149 F.2d 81, forbids the proper use of an articulate breakdown of component values so long as the evidence shows that separate values are tentatively determined in the course of ascertaining the economic value for the theoretical sale of the whole. Any other rule would produce absurdities both in economics and judicial administration. Thus, applying it literally, an expert put on the stand, after first testifying as to his general qualifications, could be asked but two questions: (1) do you have an opinion? (2) what is your opinion as to the total value of the entire property if sold to a single purchaser? It takes no great prescience to predict that any such procedure would be severely condemned. And if — as the Court implies — the expert is not permitted to elucidate on the breakdown of constituent values in the course of his direct examination, he certainly would not be permitted to go into it on cross examination. The trier of fact would then have a bald, naked opinion, nothing more, nothing less.
 
 
 114
 The quest for the hypothetical seller meeting the hypothetical buyer negotiating on a hypothetical sale which would never in fact be made has not yet reduced the Fifth Amendment to any such absurdity.
 
 
 115
 Moreover, this case was not tried before the Commission under any artificial procedural shackle by which one and only one figure could ever be stated. In the first place the Court's charge (XXIV) stated that value "is to be ascertained and fixed on just consideration of all the uses for which the property is suitable, and evidence as to all such uses may be offered by either side."[18] The Commission "concluded that the weight of the evidence establishes that single occupancy of the plant is indicated as its highest and best use * * *." It fully understood what that meant. In the light of its holding that "* * * the property in suit, taken as a whole, had no counterpart in New Orleans or surrounding area," the Report stated the problem in traditional terms. "The appraisal of the fair market value must be made considering the informed willing hypothetical seller and purchaser * * *" of the whole.
 
 
 116
 Equally important the Government through the questions propounded by its advocate and responses made by its experts followed exactly that same method. In detailing the evidence from Government expert Aschaffenburg (covering pages 415-447 of the Report), the first 11 pages reflect his analysis and methods employed in valuing vacant acreage (not including acreage attributable to buildings). His testimony and the Commission's analysis of it demonstrates further that the single-shot method envisaged by the Court's opinion never would work. For in his judgment the raw acreage had to be further divided into several subcategories such as submerged, batture land, etc. In other testimony, he then elaborately evaluated the buildings from a rental standpoint for purposes of capitalization. And Chart No. 3 annexed as a part of the Commission Report reflects that while his figures were different, he, as did the Dock Board experts, attributed separate dollar values to (a) land attributed to buildings, (b) the value of buildings thereon, (c) the value of open land and (d) the deductions from value on account of existing long term leases. The same was true of Government expert Johnson (pages 447-474).[19] Moreover, Johnson's testimony (as the Commission's detailed analysis of it reflects) illustrates the very process through which intelligent, conscientious, experienced, competent real estate experts go in arriving at some idea of value where, as here, there is and can be no real comparable.[20] Thus the Government's own expert valued vacant land, not on the basis of the Dock Board rental rates of $200 to $350 per acre which this Court lays down as the imperative standard,[21] but rather upon a reconstruction based upon his entire judgment and experience. That professional opinion, as with that of others, was a matter for the triers of fact to weigh in the light of all other evidence.
 
 
 117
 For similar reasons I think there is no basis for the Court's criticism that fixing rental values for vacant land by a specified return on stated land values "is the reverse of the usual process of ascertaining the value of land by capitalizing its rental potential." A consideration of the detailed Report shows that all of the experts — recognizing that in the final analysis it was a matter of informed judgment — used various methods to test the result. In such testing, an element which is proved by one approach is assumed to be established in determining another.[22]
 
 THE LESSEES' INTERESTS.
 
 118
 If I can understand what the Court says, the Lessees for all practical purposes are the real victims of a fiction. In the Court's preoccupation with the hypothetical ideal of a single seller and a single purchaser of property that never was nor would be sold, the Lessees with valuable advantageous leaseholds are caught between two fictions.
 
 
 119
 The Court reasons that the leaseholds had no extraordinary value because theoretically on May 1, 1951 — the instant before condemnation — they could have obtained like space from the unleased portions of Michoud itself. And as to those few leases which the Court seems to recognize might have some extraordinary advantage, the loss sustained by the Lessees is not recoverable because the cost to them of replacement space was brought about by the Government taking of Michoud itself.
 
 
 120
 Thus what has no value suddenly becomes irreplaceable. I do not think that the Fifth Amendment has yet become so fictionalized by United States v. Cors, 1949, 337 U.S. 325, 69 S.Ct. 1086, 93 L. Ed. 1392.
 
 
 121
 The record and the Commission's findings show the existence of a real economic value in favorable leases. The loss of the Lessees is the loss sustained by having that valuable interest taken away. The loss does not come from the increased costs by virtue of the Government condemnation.
 
 
 122
 DISPOSITION ON REMAND.
 
 
 123
 I have two principal concerns as to the Court's proposed disposition on remand. The first is that I am baffled by the outlined disposition on remand. I try to put myself in the position of the District Judge. Just what is he to do? What fact findings are to be respected? Where is he to find the subordinate facts upon which presumably he is to make some more of his own?
 
 
 124
 The second is that while it does not mandatorily order a retrial before a jury, the Court's comments, quotations and directions add up to another stricture against the use of Commissioners under any circumstance. The case began as a complicated one. It is still complicated. We have merely added to its complications.
 
 
 125
 The presence of a Judge on the bench in the presence of 12 jurors is not going to change it. Except as to cost of reproduction (which the Commissioners rejected), not a single thing we have had to deal with turns upon the admissibility of evidence as such. The hope expressed therefore in United States v. Leavell & Ponder, Inc., 5 Cir., 286 F.2d 398, 409,[23] will not invest us or the trial Judge with the power of an alchemist: we cannot make simple that which is complex.
 
 
 126
 I only know one thing: this case will be back with us years and thousands and thousands of pages later.
 
 
 127
 It has been tried on legal principles to which there was no timely objection registered or preserved. It was certainly the kind of case making a jury trial unsuited. F.R.Civ.P. 71A(h). Fact findings have been made by the body constituted under the rules to determine such a case. There, in the main, it should end. For that is the meaning of clearly erroneous even in condemnation cases.[24]
 
 
 
 Notes:
 
 
 [1]
 The Government assigns only one error as to receipt of evidence — testimony on reproduction cost which was rejected by the Commission
 
 
 [2]
 Of the seven numbered specifications of errors, plus those running from 2(a) through (y), the Government complains of none save the instruction on original and reproduction costs. This is a matter of no consequence since the Commission's Report expressly rejects this as a basis for the award
 
 
 [3]
 The Supreme Court has many times pointed out the elusive nature of this problem especially where large or unusual properties having no market currency are involved. See, e. g., Mississippi & Rum River Boom Co. v. Patterson, 1879, 98 U.S. 403, 25 L.Ed. 206; Olson v. United States, 1934, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; see also United States v. Wateree Power Co., 4 Cir., 1955, 220 F. 2d 226. The concurring opinion of Mr. Justice Frankfurter in United States v. Toronto, Hamilton & Buffalo Navigation Co., 1949, 338 U.S. 396, 407, 70 S.Ct. 217, 94 L.Ed. 195, dispels the easy myth that all becomes simple by exchanging the term "just compensation" for "market value." He states: "Resort to the conventional formulas for ascertaining just compensation for the taking of property rarely bought and sold, and having therefore no recognized market value, does not yield fruitful results. The variables are too many to permit of anything except an informed judgment. Everything, therefore, turns on the process of judgment to the end that judgment be not based on standards too difficult of application or evidence too tenuous for solid inference."
 
 
 [4]
 The Court states that these experts "ignored or undertook to explain as irrelevant" or "discarded as irrelevant" the fact of the large amount of space available at the low rate of 20 cents per square foot
 
 
 [5]
 Just how a witness can be "clearly erroneous" is not clear. The evidence was obviously admissible. Whether the asserted omission of this factor deprived it of any significance goes to its weight. In any case no objection by the Government is shown to the admissibility of the testimony and no error is assigned for its receipt. Even in the ideal of the jury trial epitomized in Leavell & Ponder, 286 F.2d 398, 409, which is supposed to make a complex case simple, the Judge by the so-called prompt rulings on admissibility of this kind of evidence would be engaging in dangerous business as an intrusion on the fact finding function of the jury
 
 
 [6]
 Instruction XXIV, see also substantially repeated in XXVI
 
 
 [7]
 Letters in brackets [ ] added
 
 
 [8]
 The record shows that when the Judge finished reading the corrected charge to the Commissioners he invited written exceptions and objections. The record is silent as to any objection concerning this one
 
 
 [9]
 Only slightly watered down is the Court's further declaration in disavowing a holding that the 20 cent lease rate must be accepted "as a matter of law." The Court does not stop there. The Court goes on to hold that the Commissioners erred in not considering "as one of themost important elements * * * the fact * * *" that the purchaser and seller would be "largely controlled by the fact that the purchasers' return * * * would depend on his being able to rent it on a market which, less than two years previously, had been unable to absorb a large part of it at a rental of approximately 20 cents per square foot."
 
 
 [10]
 Except to illustrate the vital difference between the two claims, I do not presently intimate any view as to the element of the award for occupancy of $2,364,940.48
 
 
 [11]
 This is a moderate summary of their testimony as the Report reflects: "However, * * * Mr. Aschaffenburg and Mr. Johnson, in their conclusions of the fair market value of the property, predicated their estimates of the expected income, in their capitalization approaches, on increases of 33 1/3% to 100% in the square foot rates of particular areas, and a weighted average increase computed by us at 70% to 80%, in the case of Aschaffenburg, and 50% in the case of Johnson, in the fair rental values, per square foot, of the buildings at Michoud at December 23, 1952, over May 1, 1951."
 
 
 [12]
 The many differences were recognized. For example, the Commission found "there were available for industrial use larger acreages in surrounding parishes, some of which had Mississippi River frontages only and some without any kind of water frontage. Likewise, there was some acreage on the industrial canal at Harvey, Louisiana, but filling and improvement were required."
 
 
 [13]
 This was cited as significant by all of the experts
 
 
 [14]
 The Report stated: "Because of the nature, character and size of the property in suit and the non-existence of any other property in the area bearing greater likeness or similarity to that in suit than those involved in the cited sales and leases of other properties, it is understandable that the appraisers had to resort to the cited sales and leases for market data. They have undoubtedly produced what their judgment dictated was the best data available under the circumstances which, we believe, demanded that greater latitude, than normally allowed, be permitted in the introduction of such market data
 "Needless to say, we cannot and do not predicate any findings or conclusions of value, or awards of just compensation solely on any individual sale or lease cited. We do not regard the evidence of market data conclusive or in itself determinative of the issues of value herein. Such evidence of that data as we have given weight, viewed in the light of the whole body of the evidence, has, however, furnished us with some indication of the values to be determined."
 
 
 [15]
 See Porter, Evaluating Industrial Real Estate, pp. 132-133 (1953); McMichels Appraising Manual, p. 307 (4th ed. 1951)
 
 
 [16]
 One of the Government experts stated that these four handled more industrial property in New Orleans than all other brokers combined
 
 
 [17]
 I am unable to understand the Court's criticism directed at the Commissioners for accepting a figure based upon square footage. I would doubt that one as seasoned as Judge Christenberry was misled by the glittering magnitude of 30,000,000 square feet. He, as must be so as to the Commissioners and the real estate experts who made a living at their trade, is presumably able to translate 43,560 square feet into the total amount to ascertain the price per acre. Moreover, there is positive testimony that "* * * industrial property is sold on a square foot basis" in New Orleans. Cargo shipped by air is rated by pounds, by rail, hundred weights, by ship, tons. But businessmen somehow handle the arithmetic
 
 
 [18]
 If this was an error, the Government did not object below and it asserts none here
 
 
 [19]
 He treated vacant land in four main categories, attributing a separate per acre dollar value to each to produce a total value of $2,305,697.00 for the open land
 The report then discusses in detail his calculations on a capitalization method for producing the effective value of the buildings and land thereunder. Chart No. 3 reflects this value separately stated at $3,705,555.
 
 
 [20]
 Thus, for example, his estimate of $4,000 per acre for land in category "G" — Protected by Levee — was referable to three cited sales. Starting with an adjusted cost of raw land at Michoud of $1,455 he then added increments such as the following to reflect advantages of the Michoud property over the cited sales:
 For sewerage facilities $500 per acre
 For drainage 500 per acre
 Michoud cleared, leveled
 and graded 300 per acre
 Michoud waterfrontage
 greater 400 per acre
 Location of Michoud somewhat
 better 500 per acre
 These or similar adjustments produced Michoud values of $3,655 to $4,244 which he rounded off at $4,000.
 
 
 [21]
 The Court states on vacant land values: "We think it is plain that in the absence of any substantial evidence to the contrary, it must be taken * * * that the rental rates for the land * * * in effect as of January 10, 1951, must be deemed to be the rents to be used for the valuing of the taking * * * May 1, 1951."
 
 
 [22]
 The law is not above such circular reasoning. Compare the test for granting an instructed verdict with that for granting j. n. o. v
 
 
 [23]
 "A jury trial at which the trial judge promptly rules on the admissibility of proper testimony and then narrows the issue by appropriate charge to the jury may, indeed, frequently simplify even what appears to be a complex valuation problem."
 
 
 [24]
 United States v. Tampa Bay Garden Apartments, Inc., 5 Cir., 1961, 294 F.2d 598; Parks v. United States, 5 Cir., 1961, 293 F.2d 482; United States v. Twin City Power Co., 5 Cir., 1958, 253 F.2d 197; Stephens v. United States, 5 Cir., 1956, 235 F.2d 467